GEORGE E. WEISS, Plaintiff-Appellant, *v.* ROCKWELL MANUFACTURING COMPANY, *et al.,* Defendants-Appellees.

(No. 55020;

First District—January 15, 1973.

Soroka & Tumbarello, of Chicago, (Joseph B. Lederleitner, of counsel,) for appellant.

Kralovec, Sweeney, Marquard & Doyle, of Chicago, (Henry J. Marquard and Charles M. Biggam, of counsel,) for appellees.

Mr. JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Weiss, sued in a three-count complaint for personal injuries alleging that he was injured while operating a Wood Shaper manufactured by the defendant, Rockwell Manufacturing Company and sold to his employer by the defendant, R. A. Ness & Company. At the close of the plaintiff's case the court directed a verdict in favor of both defendants. The sole issue on appeal is whether the evidence disclosed a factual question which could be resolved only by the jury.

Count I alleged that the Wood Shaper was defective and unreasonably dangerous in that the defendants did not recommend or provide certain accessories and that the defendants did not give adequate warning that

the cutting tool was likely and liable to kick up or push up boards being manually fed across the face of the cutting tool.

Counts II and III allege in substance that the shaper was purchased in reliance upon the recommendation of Ness and the holding out and representations of both defendants that the machine was properly designed and safe for use and that both defendants were guilty of specific acts of negligence.

The devices which the plaintiff contends should have been provided are: safety guards; guides; table top extensions; forms; spring hold down; safety ring; sliding shaper jig.

The complaint also charged Rockwell with the negligent design and manufacture of the Heavy Duty Shaper.

The evidence consisted of the testimony of the plaintiff, the defendant, Ness, and Anthony Stafanic, an employee of Rockwell, both called as adverse witnesses, and a number of exhibits. The evidence discloses that the Delta Heavy Duty Shaper consists of a motor enclosed in a metal cabinet. The cabinet top is a table 27 inches by 28 inches. Through a center hole in the table a spindle driven by the enclosed motor projects. Various shaped knives, saws and cutters may be placed on the spindle depending on the type of wood cut desired. The motor was one and one-half horsepower and could turn the spindle either clockwise or counterclockwise at a speed of around 10,000 revolutions per minute.

A fence consists of two pieces of wood, running parallel to the table edges, separated by the width of the center hole and extending at least to the edges of the table. The fence may be moved laterally depending on the depth of the cut desired. Its function is to provide a guide for the work which is placed flush against the fence and slides along to meet the cutter as it is pushed by the operator. Raymond A. Ness, called by the plaintiff as an adverse witness, testified that he was the owner of the defendant company and had been in the manufacturing of woodworking machinery as an owner or employee from 1935 until 1955. He was familiar with all brands of manufacturers of woodworking machinery, including shapers. Since 1955 he has been a distributor. He was familiar with all electric-powered hand tools. Rockwell had not changed the design of the Delta Heavy Duty Wood Shaper since 1945. An automatic feeder costing $300 could be used on the Delta Shaper. A feeder is a motor driven device with two rubber rollers in front and two behind the cutter; the work is advanced by motor power into the cutter. He sold a number of power tools including the shaper to Paul Anna Products in 1962. The shaper was a new one and it was delivered with all of the other items that were ordered. Before delivery the shaper was operated

and given a test run in Ness' shop. He was familiar with the accessories for the various machines.

The plaintiff testified he was an electrician by trade but was working as a handyman for Paul Anna Company at the time he was injured. He was present at the Ness Company with Paul and Joe Deyler, his superiors, and Mr. Ness. Paul Deyler told Ness he would like certain machines for woodworking but didn't know what type he needed. After Ness learned what type of woodworking was involved he recommended a sander, a radial saw and a drill press. Paul Deyler asked about a jointer and drew on a scratch pad the different cuts he was going to make. Ness then told him that he needed a shaper rather than a jointer; he explained that a shaper could make all different patterns and different cuttings for the different edges. They were shown two different types of shapers. Ness said the heavier one was preferable because cutting three-quarter-inch plywood would make the lighter machine vibrate; the lighter machine would have to be bolted down and would not last. The fence was not on the machine at the time Weiss saw it. Ness picked up a fence and set it on the machine. He then illustrated how the fence was used and told them if they went into the blade against the fence and pressed down and toward the blade they would not be hurt because the blades cut from the underside. The shaper with the fence attached arrived at the Paul Anna Plant about three or four days later. Ness never discussed a hold down, a jig or a ring guard.

On November 8, 1962, he cut about 100 pieces of plywood on the table saw with Paul Deyler. The Anna Company was making wooden racks which varied in length but were always the same height, width and depth. The lengths were 52, 48 and 36 inches. The width was approximately 24 inches for all three racks. The height of the 52-inch rack was 12 inches higher than the other two. The pieces of plywood were all three-quarters inch thick. He ran one piece through the shaper to make sure the cut matched the required pattern. He then ran six or seven other pieces through with no difficulty. He had operated the machine three or four times before and had never seen any manual or parts list. Joe Deyler had used the shaper and told him that he should use it the same way that Ness had shown them. He was working on a piece 48 inches long and six and one-half inches wide. His right hand was placed on the right rear part of the board, his left on the left upper part; the board was placed down over the cutter and against the fence; it was then pushed from right to left; after about 22 inches had been cut, it appeared to the plaintiff that the cutter reached a hollow spot in the plywood; the board tilted up "an inch or two." He "threw the board back down" with his hands. As he pushed the board back down he was

also pushing the board forward against the fence. Most of the pushing force came from his right hand. At the time the board tilted, his right hand was about two feet from the cutting blade. When he pushed the board back down, the cutting edges came in contact with its bottom edge. The board tilted again against the fence and his right hand went over the board into the cutters causing injury to the last three fingers of his right hand. They were later partially amputated.

Anthony Stafanic testified that he was employed by Rockwell for 11 years. He identified two of the manuals in evidence as publications of his company. He testified that a spring hold down was intended to permit the user to fashion an edge on a narrow piece of wood when the user would be unable to do so without a helper. When asked whether the spring hold down would "be of some help [in] stopping the board from bouncing up" he answered, "Not necessarily, but it is a helper." He did not consider the jig "essential" to the shaper.

Though others are mentioned in the exhibits, the accessories referred to in the testimony, in addition to the fence and feeder, are: a table extension; a sliding jig; a ring guard; a spring hold down.

A table extension is attached to the side of the table and is used for exceptionally long pieces of wood.

A sliding jig is described as a type of form upon which the work is fastened by means of a clamp and which fits into a slot in the table. The jig is then advanced to the cutter by hand.

A ring guard consists of a metal strip connected to the table the end of which strip is a loop which fits over and is concentric with the spindle.

A spring hold down consists partly of two metal rods at right angles to each other; one is connected to the table, the other extends over the work and bends at the end to extend downward until it is flush with the table. The rod which extends over the work is inserted through a collar with a thin steel spring attached. The collar is tightened by means of a bolt. The spring which is attached to that part of the rod extending over the work is used to hold the work down. The spring attached to that part running perpendicular to the table is used to hold the work in. At least two springs may be used on either part of the rod.

Ness testified that he determined that the operation described by Deyler was a custom operation rather than a production one and the feeder ordinarily is used only in production operations.

The manuals were published by Rockwell. On p. 105 of the Plaintiff's Exhibit 5 the manual states:

"COMPLETE SAFETY FEATURES. Exposed belts and pulleys should be covered, and a ring guard should be available to protect the operator when doing free-hand work *without the fence.*

Available accessories should include a safety shaping jig for use when shaping *short or narrow pieces.*" (Emphasis added.)

p. 106:

"SPRING HOLD DOWN. Spring hold downs hold work firmly against the fence and table to permit *accurate* straight line shaping." (Emphasis added.)

On page 6 the manual stated that the ring guard should always be used when shaping curved work directly against the collars and that the sliding jig is used chiefly in returning mouldings across the end of narrow strips. The manuals contain many illustrations showing the shaper being used with the various accessories. They also contain illustrations showing the shaper being used without any of the accessories.

For the sake of clarity the three theories of recovery advanced by the plaintiff, strict liability, express warranty and negligence, will be discussed separately.

Although the plaintiff now contends that the lack of reasonable safety devices on the shaper constituted a defect under strict liability, he is bound by the allegations of his complaint. The count under strict liability alleges that the shaper was defective and dangerous for two reasons: 1. the defendants did not recommend or provide certain accessories, and 2. did not give adequate warning that the cutting tool was likely and liable to kick or push up boards that were manually fed into the cutters.

■■ Implicit in the first reason ascribed is the *duty* of the manufacturer to recommend to or provide every buyer of the shaper certain accessories. Needless to say, this would require the manufacturer to confer with every prospective buyer and make a judgment, at his peril, of what the buyer needed. Alternatively, the manufacturer would be under a duty to recommend to or provide the buyer *all* of the accessories available regardless of how limited was the intended use. No case has been cited, nor do we think one exists, extending the doctrine of strict liability to this extreme.

■■ The second ground involves the duty to warn which "is no stranger to the law of Illinois." (*Williams v. Brown* (1968), 93 Ill.App.2d 334, 360, 236 N.E.2d 125.) In the case of *Kirby v. General Paving Company* (1967), 86 Ill.App.2d 453, 457, 229 N.E.2d 777, the court said:

"A duty to warn exists where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given."

In this case, the plaintiff and the defendant share equally knowledge of the practical application of the basic laws of physics, if not the underlying principles. It requires no special instruction or training to know

that, unless some type of pressure is applied to a piece of three-quarter-inch plywood when it is placed against heat treated steel knives fixed on a stationary spindle rotating at a speed of 10,000 revolutions per minute, the plywood will be thrown off the blades. In fact, the evidence itself shows the plaintiff knew this before the accident. He testified that Ness told them to press down and toward the blade; he also testified that he was pushing down and forward against the fence. He certainly knew that the blade would "kick or push up boards" after it did exactly that the first time. Yet he continued to operate the shaper. Under the circumstances there was no "unequal knowledge" and, thus, no duty of the defendants to warn of a fact that was already apparent.

The plaintiff relies on *Wright v. Massey-Harris, Inc.* (1966), 68 Ill.App.2d 70, 215 N.E.2d 465, and *Dunham v. Vaughn and Bushnell Manufacturing Co.* (1969), 42 Ill.App.2d 339, 247 N.E.2d 401. In *Wright v. Massey-Harris, Inc.,* the complaint alleged that the defendant sold a self-propelled corn picker to the plaintiff without a shield or guard, that the defendant knew or should have known that the absence of a shield or guard rendered it unsafe and the *"defect and danger was* [sic] *not appreciated nor evident* upon an inspection  \*  \*  \*." (Emphasis added.) The complaint was dismissed, and the appeal questioned only the propriety of the trial court's determination that the complaint did not state a cause of action. After the trial court's ruling but before the Appellate Court's opinion, the Supreme Court decided *Suvada v. White Motor Co.* The opinion relied entirely on its interpretation of *Suvada* and held only that a claimed defect in design is as actionable as a defect in manufacture. It is of utmost importance to note the allegation of the complaint (taken as true by the motion to dismiss) that the defect was not evident upon an inspection.

In *Dunham v. Vaughn and Bushnell,* the plaintiff was injured when, while using a hammer, a chip broke off from the hammer and struck him in the eye. The only issue before the court was whether the hammer was defective. It was undisputed that, if a defect existed, it was a latent one.

■■ The plaintiff next contends that Ness held out and represented that the machine was properly designed and manufactured, that the plaintiff's employer relied on the recommendations, holding out and representations of Ness and that he was injured due to the "careless and negligent representations [and] recommendations" of the defendant. The evidence shows that Ness suggested a one and one-half horsepower, three phase motor and told Deyler he (Deyler) wanted a shaper instead of a jointer. Aside from the serious question of whether recommending something is action-

able, suffice to say the record is competely devoid of any causation due to the use of a shaper rather than a jointer or a one and one-half horse-power, three phase motor rather than some other type of motor.

The plaintiff's principal, if not entire, argument on the question of express warranty rests on the testimony of the plaintiff:

> "A. Then he [Ness] proceeded. He picked up the same pad Paul was drawing on, and he said, if he goes against the machine this way, if you went into the blades against the stopper or the fence and you press down and toward the cutter there would be no worry about getting hurt because the cutter cuts from the under-side. And as long as it's tight against the fence you wouldn't have to worry."

These words of Ness, the plaintiff argues, constitute an express warranty citing *Beckett v. F. W. Woolworth Co.* (1941), 376 Ill. 470, 34 N.E.2d 427, and *Lindroth v. Walgreen Co.* (1950), 407 Ill. 121, 94 N.E.2d 847.

Express warranties are governed by the Uniform Commercial Code, Chapter 26, Section 2—313, which provides:

> "(1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

■■ Thus, to be actionable under the theory of express warranty the claim must be based on an affirmation of fact or promise which is not a statement representing the seller's opinion or commendation of the goods and which is false.

In *Keller v. Flynn* (1952), 346 Ill.App. 499, 508, 105 N.E.2d 532 the court said:

"To determine whether or not there is a warranty, the decisive test is whether the vendor assumes to assert a fact of which the buyer is ignorant, or merely states an opinion or judgment on a matter of which the vendor has no special knowledge, and on which the buyer may be expected also to have an opinion and to exercise his judgment. In the former case there is a warranty and in the latter there is not."

■■ The language used by Ness is not an affirmation of fact or a promise but rather his personal opinion. (*Olin Mathieson Chemical Corp. v. Moushon* (1968), 93 Ill.App.2d 280, 235 N.E.2d 263; *Hollenbeck v. Ramset Fastener's, Inc.* (1966), 267 N.C. 401, 148 S.E.2d 287.) Moreover, the vendor here certainly did not assert a fact of which the buyer was ignorant. Ness was not possessed of any special knowledge. The same observations made with reference to the duty to warn are appropriate here. The vendor and vendee could both see the danger of the device in operation, that the blades cut from the underside, and that pressure was required to hold the board down and against the cutter.

In addition, the plaintiff failed to prove Ness' statement was false. Ness' conclusion that there "would be no worry about getting hurt" was conditioned on the board being "tight against the fence." At the time the plaintiff was injured the board was not tight against the fence. *Cf. Bender v. William Cooper and Nephews, Inc.* (1944), 323 Ill.App. 96, 55 N.E.2d 94.

The cases cited by the plaintiff are inapposite. In the *Beckett* case, the Supreme Court reversed because the plaintiff had failed to prove the buyer relied on the representation of the seller. It made no determination that the representation did constitute a warranty.

In the *Lindroth* case the saleslady told the purchaser that a vaporizer would not boil dry for two hours. This was clearly a statement of fact of which the buyer was ignorant. The vaporizer boiled dry in forty minutes and caused a fire.

The count under common law negligence contains several allegations of specific acts of negligence which are, for the most part, repetitions of the allegations under the other two counts. What has been said before with respect to express warranty and strict liability is applicable to the allegations of failure to recommend and of negligently holding out or representing. They need not be repeated.

As to the allegation of failure to warn we note that a case cited by the plaintiff recognizes that Section 388, Restatement of Torts, Second Edition, is a correct expression of the substantive law with respect to the common law liability of a manufacturer. (*Biller v. Allis Chalmers Manu-*

*facturing Co.* (1962), 34 Ill.App.2d 47, 52, 180 N.E.2d 46.) That Section is as follows:

"§ 388.   Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

In the Reporter's Notes is Comment k:

"Comment on Clause (b):

k. *When warning of defects unnecessary.* One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made. However, the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous. In such case, if the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize."

In *Trust Co. of Chicago v. Lewis Auto Sales, Inc.* (1940), 306 Ill.App. 132, 28 N.E.2d 300, the court cited this Section of the Restatement in up-

holding a directed verdict on behalf of the seller of an automobile with defective brakes when the evidence showed the buyer was aware of the condition of the brakes at the time of purchase.

We again observe that there was no duty to warn in the case at bar because the danger of the rapidly spinning blades was as well known by the plaintiff as by the defendants.

The plaintiff also alleges that the defendants were negligent in that they failed to inform the purchaser of the existence of the accessories. To state a cause of action this allegation must be based on the assumption that the purchaser would have bought the accessories if he had known of their existence. Consequently, to sustain this allegation the plaintiff is required to prove that the purchaser would (or even was likely to) buy the accessories if he had been informed of their existence.

Since this was custom work rather than production, a roller was unnecessary. A table extension was used only for exceptionally large pieces of wood and was also unnecessary. Sliding jigs were used chiefly in returning mouldings across the end of narrow strips, which was not the work being done by the plaintiff's employer. Stafanic testified that he did not consider the jigs essential. Ring guards were to be used when shaping curved wood directly against the cutters without the fence. This was not the work being done by the plaintiff's employer.

■■ The only accessory which apparently might have been used was the spring hold down. No evidence was introduced to show how much pressure the springs exerted nor to show that the boards would not have kicked up if the spring hold downs had been used. The manual indicates that the principal function of a spring hold down is to insure accuracy. The witness called by the plaintiff, Stafanic, testified that a spring hold down was intended to permit the user to fashion an edge on a narrow piece of wood when the user would be unable to do so without a helper. He also said it would not necessarily stop the board from bouncing up, but it was a "helper." Although he was called under Section 60, the plaintiff was bound by his testimony since it stood uncontradicted and unrebutted. *Murphy v. Vodden* (1969), 109 Ill.App.2d 141, 148, 248 N.E.2d 327.

■■ We conclude, therefore, that the plaintiff has failed to prove that the employer would have purchased the spring hold down or any of the accessories, other than the fence, if he had been informed of their existence.

Last, the plaintiff alleges that the defendant negligently failed to install the various safety devices on the shaper and negligently designed and manufactured the shaper.

The case of *Murphy v. Corey Pump and Supply Co.* (1964), 47

Ill.App.2d 382, 197 N.E.2d 849, dealt with a complaint alleging negligence on the part of a manufacturer of a power rotary mower for failure to furnish a guard in front of the blades. The trial court granted summary judgment in favor of the defendants. In upholding the trial court the Appellate Court said:

> "In the instant case, the claim is based on the theory that the manufacturer failed to design a safety guard or protection of some sort which would have prevented plaintiff's injuries. The alleged defect in this mower was not latent or concealed. It was obvious to anyone. It was apparent to any observer that the revolving blades were not guarded, and if any part of the human body came in contact with the revolving blades when the machine was in operation an injury must follow." (p. 393.)

The court quoted from *Campo v. Scofield* (1950), 301 N.Y. 468, 95 N.E.2d 802:

> "If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof. Just as the manufacturer is under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out [omitting citations], so he is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. To illustrate, the manufacturer who makes, properly and free of defects, an axe or a buzz saw or an airplane with an exposed propeller, is not to be held liable if one using the axe or the buzz saw is cut by it, or if someone working around the airplane comes in contact with the propeller. In such cases, the manufacturer has the right to expect that such persons will do everything necessary to avoid such contact, for the very nature of the article gives notice and warning of the consequences to be expected, of the injuries to be suffered. In other words, the manufacturer is under no duty to render a machine or other article 'more' safe—as long as the danger to be avoided is obvious and patent to all. To impose upon a manufacturer the duty of producing an accident-proof product may be a desirable aim, but no such obligation has been—or, in our view, may be—imposed by judicial decision." pp. 399-400.

In the case at bar the shaper functioned properly for the purposes

for which it was designed; it was without any latent defect; and its functioning created no danger or peril not known to the user.

■■ For these reasons we conclude that the evidence, viewed in its aspect most favorable to the plaintiff, so overwhelmingly favors the defendants that no contrary verdict based on this evidence could stand under any of the three theories advanced by the plaintiff. The trial court correctly directed the jury to find in favor of the defendants. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504.

In view of our holding we deem it unnecessary to pass on the other arguments of the defendants, that the plaintiff was guilty of contributory negligence as a matter of law and that the evidence failed to show that the absence of the devices was a proximate cause of the injury.

The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.