GEORGE MARTINET, Plaintiff-Appellee, *v.* INTERNATIONAL HARVESTER CO. *et al.*, Defendants-Appellants.

First District (1st Division)   No. 76-308

Opinion filed September 12, 1977.

Lord, Bissell & Brook, of Chicago (Paul C. Nelson, Wallace E. Maloney, William J. White, and Hugh C. Griffin, of counsel), for appellants.

Sidney Z. Karasik, of Chicago, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, George Martinet, sued International Harvester Co. (IH), the manufacturer, and Howell Tractor & Equipment Company (Howell), the seller, for personal injury suffered while using a bulldozer tractor. Plaintiff dismissed the negligence counts of his complaint at trial, but the counts alleging strict liability in tort were tried before a jury in the circuit court of Cook County. The jury returned a general verdict in favor of the defendants. On motion of plaintiff, the trial judge set aside the verdict and ordered a new trial. We granted defendants' petition for leave to appeal from the order granting a new trial.

Defendants argue on appeal that the order must be reversed because (a) the evidence on the issues of defect and proximate causation was sufficient to support the jury's verdict alone, and furthermore (b) the evidence on the issue of assumption of risk by the plaintiff was sufficient to support the verdict. Plaintiff argues that (a) the grant of a new trial was based on several grounds, any one of which, standing alone, would merit the relief granted and cumulatively compel the court's order, and (b) defendants have not met their burden on appeal of demonstrating a clear abuse of discretion by the trial court.

It is necessary for an understanding of the competing claims of the parties to make a somewhat detailed description of the machine in

question. The IH TD-9 is a machine of the approximate size of a compact automobile and is one of the smallest bulldozers made. The motive power is provided by a diesel engine and the power is transferred to the ground to move the machine by means of a metal track on each side of the machine. Between the engine and the tracks, the drive chain contains a clutch and a gear box which provides four forward and two reverse speeds. The bulldozer blade extends across the front of the tractor and is suspended from the machine by four arms or levers; two function as the means of attachment of the blade; the other two function as levers connected to an hydraulic system which raises and lowers the blade as desired. The attachment arms extend from the blade on either side to attach to the body of the machine at pivot points located midway between the front and back of the machine and about one foot above the ground. The lifting arms are suspended over the tracks from the front of the tractor to a point approximately three feet directly above the pivot point of the attachment arms. The lifting arms thus hang about knee-high above the tracks on either side of the tractor for the forward half of each track's length. Suspended above the rear half of each track's length and thus on either side of the operator's seat are the hydraulic cylinders and rigid metal suspension system for the hydraulic and the lifting arms.

The operator's seat is located above the tracks at the rear of the tractor. The operator's controls include a foot-operated brake pedal for each track which can be locked in an engaged position. All other controls are hand-operated; these consist of steering clutches for each track, a gear selector lever located on the right side which allows selection of the forward or reverse gears or a neutral position, and a clutch lever located at the left side of the floor in front of the seat. The clutch is disengaged, thereby cutting off the power from the engine to the transmission, by pushing it toward the front of the tractor, and engaged by pulling it back toward the rear. The clutch differs from that commonly found in automobiles in that there is no spring or other force built into the mechanism to return the lever to an engaged position after it is disengaged; that is, absent an outside force, the clutch will remain engaged or disengaged when the operator removes his hand from the lever.

The TD-9 in question at trial was manufactured by IH in 1957 and purchased by plaintiff's employer from Howell in 1957. The accident occurred on July 27, 1971.

Plaintiff was the only occurrence witness. He had been hired by his employer in 1961 and began to operate the TD-9 about four years later. Prior to the day of the accident, he had never experienced difficulty operating the TD-9. He always mounted the machine in the same way: approaching the machine from the left side, he placed one foot on the

attachment arm of the blade assembly, then placed his other foot on the track partly beneath the lifting arm, then swung his first foot and leg up and over the lifting arm so that he straddled that arm, then brought his other leg over the arm, stepped along the track and sat in the seat. While climbing over the lifting arm, he would hold onto it for balance and support.

He testified that if he had to dismount the machine during the workday, he would leave the motor running because the diesel engine required a cool-down period between stopping and restarting, which would needlessly interrupt the work.

The day of the accident was hot and dry, but the peat soil on which he was working was "mucky" and "slimy" just beneath the surface. He was levelling the field and had backed the TD-9 to a point where he could attach a disc roller to the tractor's draw bar. He left the transmission in low reverse gear, disengaged the clutch by pushing the clutch lever forward, and dismounted to attach the disc roller, leaving the motor running. He had followed this sequence many times before and had observed his employer do it the same way.

After making the attachment, plaintiff began to mount the machine in his usual manner, but as he started to lift his left leg over the lifting arm he slipped and fell forward, striking the clutch lever with his right hand. The clutch engaged and the tractor moved backwards under power. Plaintiff was pulled by the moving track underneath the lifting arm support and hydraulic cylinder support arm. He was not able to pull his left leg out until, after struggling against the pull of the track, he managed to reach the clutch lever and disengage it. As a result of the accident, plaintiff's left leg required amputation.

Plaintiff also testified that he did not see the owner's manual issued to his employer at the time the TD-9 was purchased until after the accident. He saw no safety warnings affixed to the machine. He was familiar with a bulldozer known as the TD-9B, built by IH, which differed from the TD-9 in that it had a handhold attached for the operator's use in mounting and the blade-lifting hydraulics did not obstruct the operator's path to his seat. A similar sized bulldozer, fabricated by a different manufacturer, has the same features as the TD-9B. Plaintiff testified that he did not believe it was unusual to leave the TD-9 in gear when dismounting.

On cross-examination, plaintiff testified that even with his prosthetic leg he continues to operate the TD-9 for his employer and still mounts the machine in the same manner. He considered the TD-9 to be a simple, easy and enjoyable machine to operate. He knew that it was possible to put the transmission in neutral and agreed that it should be placed in neutral when dismounting "most of the time." He acknowledged that it took little time or effort to change gear and that there was no efficiency reason for

leaving in it reverse before the accident because his next movement would be forward. He had worked in slippery fields for his employer for 10 years before the accident and knew that slippery substances could stick to the tracks and make them slippery. "Natural" handholds were present on the TD-9, notably the lifting arm and he always used them when mounting. He didn't know "exactly what happened" or why he slipped at the time of the accident. He knew before the accident that if the gear shift lever was in a drive position and the clutch was then engaged the tractor would begin to move. He knew before that accident that if he stood on the track and the track began to move, he would be in a position of danger. When asked if he consciously left the transmission in reverse, plaintiff stated, "I couldn't say it was an oversight. I just did it."

On redirect examination, he testified that if the transmission was left in gear and the clutch was disengaged, the tractor would not have moved. Running the TD-9 was part of his assigned duties; as an employee he had no choice of which machine to use to do a job.

Plaintiff's employer Tameling testified for plaintiff that he had purchased the TD-9 new from Howell in 1957 and that the bulldozer blade was attached when it was delivered. He felt the only practical way to mount the machine was from the left side and in the same manner as described by plaintiff. He sometimes left it in gear when dismounting himself. On cross-examination, he stated that plaintiff still operated the TD-9, as well as another, larger machine which requires several steps up a ladder to mount. In training plaintiff to operate the TD-9, Tameling did tell plaintiff to disengage the gears when dismounting. The owner's manual states that it should always be in neutral before dismounting. He always felt that the mounting method he described was dangerous. On redirect examination, Tameling testified that he did not attach any handholds to the TD-9 because he "wouldn't know where to put them.

Plaintiff called Jeremy Davis as an expert witness. Davis testified as to his qualifications, including a master's degree in engineering and his registration as an engineer in Illinois and other States, memberships in several professional societies and 30 years' experience in design engineering, which he defined as that branch of engineering in which an idea is formed and translated into drawings from which machinery is built. Though he had never operated a diesel-powered machine or an earth-moving machine, he did not need to operate such machines to understand how they worked. He inspected the TD-9 in question for two hours in August of 1974, taking measurements and photographs in the process. At this point, several photographs were admitted into evidence. He described the workings of the clutch. With the clutch disengaged fully, the drive train is "100% disengaged" and the machine will not move even if left in gear. If the transmission were in neutral and the clutch

disengaged, the drive train is "200%" disengaged because it is disconnected in two places. If the brakes were also locked at the same time there would be "300%" safety, and so on, up to turning the engine off. In his opinion, leaving the machine in gear when dismounting, as Martinet did before the accident, was not unreasonably dangerous; the machine would safely be held by the clutch.

Davis testified, over objection, that the easiest way for an operator to mount the TD-9 would be to step on the attachment arm, then up on the tread, then over the hydraulic cylinder next to the driver's seat, then sit down. He found it awkward to mount in this manner because of the obstacle he had to climb over, even though he was six feet, five inches tall. The defense objected to this testimony on the grounds that plaintiff testified that he himself mounted in a different manner and that therefore Davis's testimony was irrelevant. The objection was overruled. Davis went on to testify that the difficulty he experienced in mounting the machine was the result of two factors: (1) the height of the steps or obstacles it was necessary to mount and (2) the lack of any convenient handholds. The owner's manual for the TD-9 was admitted into evidence and Davis testified that there was no reference or photograph in the manual explaining how to mount or dismount a TD-9 with a bulldozer blade attached. In his opinion, the TD-9 with a blade attached was "quite unsafe" to mount. Bulldozer-type machines had been manufactured before the TD-9 which had placed the blade-lifting mechanism far ahead of the operator's seat and posed no obstacle to mounting. Over objection, he testified that there was "no reason whatsoever" why the TD-9 could not have been designed and manufactured so that the path to the seat would be unobstructed. Handholds could have been added at a cost of two to three dollars each.

On cross-examination, Davis admitted that, prior to his investigation for this case, he had never designed, worked on, examined or had anything to do with bulldozers. Even on the day of trial he did not know how plaintiff Martinet had mounted the TD-9. A defense motion to strike his earlier testimony was denied. He did not have occasion to study the weight and balance of the subject machine, but he acknowledged that putting all of the lift mechanisms in the front of the TD-9 would destroy its inherent balance and desirable low center of gravity. He considered the entire blade mechanism to have been an afterthought, added after the tractor itself had been designed; as a tractor, without the blade, there would have been no access problem.

Plaintiff rested and the defendants' motion for directed verdict was denied.

Robert Farrell, safety director of the Northern Illinois and Northern Indiana Operating Engineers Union, testified for defendant IH. His

occupation included working with management in the construction industry in regard to governmental regulations and training in construction safety. He had operated bulldozer-type equipment for 40 years. He was a member and officer of numerous construction safety organizations, including the National Safety Council. He was familiar with and had operated the TD-9 many times. He testified that the standard operating procedure when dismounting the tractor is always to leave the transmission in neutral so that there would be no hazard in bumping the clutch lever. He considered mounting and dismounting the TD-9 to be no problem when mounted in the manner described by plaintiff. In his opinion, there was no unreasonable danger in mounting the machine. He had never heard of an accident with the TD-9 prior to that of plaintiff. The lifting arm is a "natural handle" and, in his opinion, no extra handles were needed to make the mounting safe. In all track-type machines it is normal for the operator to step on the track when mounting. Because of differences in size and purpose, it is not fair to compare the blade mounting of the TD-9 to other machines. On cross-examination, he acknowledged that it is necessary for an operator mounting the machine to straddle the lifting arm and pivot a quarter-turn in approaching the seat. He also admitted that in his experience the track of a machine in normal use gets dirty and can be slippery.

Josh Prosek, a registered engineer employed by IH as an engineer for 40 years in various departments, testified that the center of gravity of the TD-9 was low in the center of the track, the most desirable place. Good visibility was designed into the TD-9. The blade was attached to the machine in the place and manner indicated in order to preserve the weight distribution balance and to permit downward pressure to be put on the blade, which is a desirable feature. In his opinion, there is no danger to the operator in mounting the machine because of the blade attachment or lifting arms. In his position at IH, reports of complaints and accidents involving IH bulldozers came to his attention and he had never seen a complaint or report of an accident involving the design of the TD-9. IH recommends to purchasers that the tractor transmission always be placed in neutral before dismounting.

On cross-examination, Prosek testified that the blade apparatus was not part of the TD-9 original design and the owner's manual makes no reference to the blade apparatus. Disengagement of the clutch disengages the engine from the track completely. There is more than one way to mount the bulldozer and there are many places on the subject machine which could be used as handholds. The width of the track is 13 inches on the TD-9, which the witness considered an adequate width for a man's foot to be supported in mounting. The later-produced TD-9B has no lifting arm or hydraulic cylinders impeding access to the seat, but when

the TD-9 was first designed it was not feasible to attach the blade so as to prove no obstruction to the driver's compartment. The witness refused to characterize the blade attachment as an afterthought. On redirect, Prosek testified that the track width provided with the tractor varied at the customer's option and that the TD-9 had available track shoe widths of 13, 14, 15, 16, 18, 20 and 22 inches.

Defendant Howell called as its first witness Anton Cerveny, an employee of Howell, who delivered the TD-9 to plaintiff's employer and instructed the employer in the proper operation of the machine. He always went over the operator's manual with the purchaser, page by page, including the warning printed in the manual to always leave the machine in neutral before dismounting with the motor running. He himself installed wider track shoes on the TD-9 in question sometime subsequent to the purchase at Tameling's premises. He always mounted the machine from the rear because it was easy for him to do so; but mounting from the left side, as described by plaintiff, was not difficult for him, who had described himself as "short." On cross-examination, Cerveny testified that there was nothing in the manual he had delivered with the machine about the blade mechanism and neither he nor the manual told the buyer how to mount the machine.

Raymond Hughes, vice-president and product manager for Howell, testified that in his 20 years at Howell he had never heard a complaint about the difficulty in mounting the TD-9. He has no difficulty straddling the lifting arm in mounting. Because the condition in which the machine is normally used includes brushy areas, extraneous handles attached to the machines are likely to be knocked off. It was not unusual to use the TD-9 in mud or wet earth.

The defendants rested and motions for a directed verdict by plaintiff and defendants were denied. The jury returned a general verdict for the defendants. In ruling on the motion for a new trial, the court stated its belief that the jury verdict was "against the greater weight of the evidence" on the issue of whether the design of the TD-9 was unreasonably dangerous and granted plaintiff a new trial.

The first question for determination is the standard to be applied in this court when reviewing a trial court's grant of a new trial. This issue was recently considered by this court in *Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 359 N.E.2d 1078, where an analysis of the somewhat confusing pronouncements of our courts on the standards to be applied in ruling on motions for new trials led to two conclusions: (1) the standard to be used by the trial court in determining a motion for a new trial is the preponderance of the evidence test, and (2) the standard to be used by a reviewing court in determining the correctness of a trial court's ruling on a motion for a new trial is whether the trial court abused its discretion or

whether its ruling was against the manifest weight of the evidence. See also *Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 144, 357 N.E.2d 500, 502.

■■ In a suit based on the theory of strict liability in tort, the plaintiff has the burden of proving that there existed in the product a condition or conditions that rendered it unreasonably dangerous. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) The unreasonably dangerous condition can be the result of a design defect. *Williams v. Brown Manufacturing Co., Inc.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.

■■■ After a careful examination of the record, we find, under the evidence and the applicable legal principles, that plaintiff failed to prove either a defective design of the TD-9 or that if any defect in the design existed it made the TD-9 unreasonably dangerous. The verdict of the jury was correct and the trial court's grant of a new trial was against the manifest weight of the evidence and an abuse of its discretion. It must be emphasized that "to establish liability in strict tort it is not sufficient that the plaintiff prove the product was dangerous; he must prove that it was unreasonably dangerous, or in other words not reasonably safe." (*Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 83, 319 N.E.2d 232, 234.) The question of what is or is not unreasonably dangerous is a question for the jury (*Dunham v. Vaugham & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401) and the jury's verdict for defendants in the instant case can, among other things, mean that this issue was resolved against plaintiff.

Our review of the evidence concerning defective design and unreasonable danger reveals that there was no direct evidence of defectiveness or an unreasonable danger in the manner alleged. Plaintiff himself testified that he did not consider the machine dangerous and continued to operate it at the time the case was tried. Plaintiff's employer testified that he always considered his own method of mounting the machine "dangerous," not unreasonably dangerous.

Plaintiff's expert witness did testify that the TD-9 was "quite unsafe," a qualified opinion that we do not judge to be the equivalent of saying it was unreasonably dangerous, and even if it were so considered, a jury is not required to accept the opinion of an expert on the ultimate issue in the case. (*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 122, 273 N.E.2d 809, 811.) The expert also based his opinion, at least in part, upon his own mounting of the machine in a manner different from the manner in which plaintiff mounted the machine at the time of the accident. This fact considerably lessens the value of his opinion. (See *Kinka v. Harley-Davidson Motor Co.* (1976), 36 Ill. App. 3d 752, 760, 344 N.E.2d 655, 662.) One of the experts called by defendant IH had 40 years' experience in operating bulldozer-type construction

equipment in the field, and the other had been principally engaged in the design of bulldozers for defendant IH for a number of years prior to trial; compared to these experts, plaintiff's expert had only minimal experience working with bulldozers. Especially noteworthy is the opinion of defendant IH's witness Farrell, a labor union official with some expertise in the field of occupational safety, which was that the TD-9 was not unreasonably dangerous to mount in the manner described by plaintiff.

■■ Considering the claims of defective design, we conclude that: (a) the hoisting mechanism for the bulldozer blade created an obstruction to the operator's access to the seat, but the manifest weight of the evidence, including the testimony of plaintiff, indicates that the obstruction was not unreasonably dangerous; (b) the lack of a guarded access route to the seat, according to the manifest weight of the evidence, did not result in a failure of the TD-9 "to perform in the manner reasonably to be expected in light of [its] nature and intended function" (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401, 403) and therefore was not unreasonably dangerous; and (c) the lifting arm provided a handhold annd the attachment arm and the track surface provided footholds, according to the manifest weight of the evidence, sufficient to enable the operator to mount the machine in a reasonably safe manner.

But even if the trial court had been correct in ruling that the plaintiff had proved by the preponderance of the evidence that the TD-9 was defectively designed and unreasonably dangerous, the manifest weight of the evidence indicates that plaintiff assumed the risk of his injury by his own conduct. In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 423, 261 N.E.2d 305, 308, the supreme court quoted approvingly section 402A of the Restatement (Second) of Torts, comment (n) (1965), that contributory negligence is not a defense to a strict products liability action because negligence of the defendants is not an element of the cause of action.

> " '* * * On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.' "

The court went on to state that the question of assumption of risk is for the jury, that it is a subjective test in that it is plaintiff's knowledge, understanding and appreciation of the danger which must be assessed, that relevant to the jury's determination are the factors of the user's age

and experience, as well as the obviousness of the defect and the danger it poses, and that the issue may arise in connection with proof of proximate causation. 45 Ill. 2d 418, 430-31, 261 N.E.2d 305, 312.

Plaintiff argues that his actions were not voluntary and therefore he could not have assumed a risk, because, as an employee, he neither had a choice of what work to do nor a choice of which machine to use. The defendants cite *Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 98, 299 N.E.2d 497, 499, for the proposition that "[a]n employee cannot exculpate himself from the legal consequences of his acts on the grounds that he is fearful of losing his job if he does not comply with his superior's orders." On the other hand, this court stated in *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 2d 971, 990-91, 326 N.E.2d 74, 87:

> "* * * In situations where the nature of plaintiff's employment requires exposure to certain hazards, it would be a *non sequitur* of the policy considerations of strict tort liability to say that plaintiff has voluntarily and unreasonably assumed such hazards by the mere acceptance of his employment. There must, we think, be an element of conscious conduct resulting in the injury which is not satisfied by mere inadvertence or momentary inattention. * * *"

In the instant case, we believe the evidence elicited from the plaintiff during cross-examination was sufficient to enable the jury to determine that there was conscious conduct on the part of plaintiff which resulted in the injury, and therefore the fact that he was an employee and was directed to do the work and use the machine does not relieve him of the responsibility to avoid a known danger. He was not instructed to leave the machine in gear with the motor running and the clutch disengaged.

Here, plaintiff was 32 years old at the time of the accident. He had been employed by Tameling for over 10 years and had been placed in a position of some authority. He had operated the TD-9 through most of his employment there and had originally been instructed by his employer in the method of operation of the machine. Tameling testified that plaintiff was told to leave the TD-9 in neutral when dismounting.

■■ Illinois recognizes a difference between a latent defect and an open and obvious one in terms of strict tort liability. In *Weiss v. Rockwell Manufacturing Co.* (1973), 9 Ill. App. 3d 906, 293 N.E.2d 375, the court affirmed a directed verdict for defendants where plaintiff injured his hand while shaping plywood on a machine manufactured by defendants. The court, in discussing plaintiff's conduct, stated:

> "In this case, the plaintiff and the defendant share equally knowledge of the practical application of the basic laws of physics, if not the underlying principles. It requires no special instruction or training to know that, unless some type of pressure is applied to a

piece of three-quarter-inch plywood when it is placed against heat treated steel knives fixed on a stationary spindle rotating at a speed of 10,000 revolutions per minute, the plywood will be thrown off the blades. In fact, the evidence itself shows the plaintiff knew this before the accident. \* \* \*" (9 Ill. App. 3d 906, 912-13, 293 N.E.2d 375, 379-80.)

Similarly, plaintiff Martinet and defendants IH and Howell share equally knowledge of the laws of physics, and it is a matter of common knowledge that a man standing on a metal track of a bulldozer, with the motor running and the transmission left in gear, will be in a position of danger if the clutch is bumped so that the track begins to move. Plaintiff clearly testified that he knew the tracks were slippery, that if the gear shift lever was in reverse and the clutch was then engaged, the tractor would begin to move, and that if he stood on the track and the track began to move, he would be in a position of danger.

■■ We believe that plaintiff's conduct in leaving the transmission in gear is properly classified as an assumption of the risk of his injury, rather than simple contributory negligence, because the manifest weight of the evidence is that plaintiff appreciated the gravity of the possible harm and the possibility of its occurrence. (See Comment, *The Knowledge Element of Assumption of Risk as a Defense to Strict Products Liability*, 10 J. Mar. J. Prac. & Proc. 243 (1977).) In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, the product involved was a trenching machine which jumped backwards when it struck, unexpectedly, an underground object, injuring plaintiff. The defect alleged was in the design of the clutch. However, the court discussed in the context of assumption of risk the fact that plaintiff was operating the machine from the rear at the time of his injury, rather than from the side as intended by the manufacturer. The court decided that this evidence raised the defense of assumption of the risk sufficiently to make it a jury question. (45 Ill. 2d 418, 427-31, 261 N.E.2d 305, 310-12.) In the case at bar, the defects alleged concerned the design of the TD-9 which made it difficult to mount. The defendants raised as a defense the fact that plaintiff left the transmission in gear when he dismounted. In *Williams*, the plaintiff would not have been injured when the machine jumped if he had been on the side instead of in the rear; here, the plaintiff would not have sustained the injury he did when he fell and bumped the clutch if he had left the transmission in neutral rather than in gear. Plaintiff's assumption of the risk was properly presented to the jury, and the jury's verdict can mean that it found for the defendants on this issue alone. The manifest weight of the evidence is that plaintiff assumed the risk and the jury's verdict was correct.

Plaintiff has raised four other issues to support the grant of a new trial

The first is that the jury was given too many instructions on the defense of assumption of risk. We have reviewed the transcript of both the conference on instructions and the reading of the instructions to the jury and we find that there were substantially equal instructions given on plaintiff's theory of strick liability and the defense of assumption of risk. Plaintiff's counsel did not object at the conference to the number of instructions, although he was successful in preventing the defendants from presenting the defense of misuse. Plaintiff was not prejudiced by the instructions.

The second issue is that the trial court believed the jury was confused as to the difference between contributory negligence and assumption of risk and the jury was not instructed that the former is not a defense to a strict products liability action. Plaintiff cannot complain of his own failure to tender such an instruction. (*Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 347 N.E.2d 496.) Furthermore, the trial court's quotation from the concurring opinion of Mr. Justice Frankfurter in *Tiller v. Atlantic Coast Line R.R. Co.* (1943), 318 U.S. 54, 68, 87 L. Ed. 610, 63 S. Ct. 58, referring to the meaning and development of assumption of risk as a defense, was inappropriate in light of the development of the law over more than 30 years, especially in the field of products liability. Our review of the evidence and instructions reveals that assumption of risk was properly raised as a defense and the jury was properly instructed on the issue.

■■ Third, plaintiff asserts that the defendants repeatedly and improperly interjected the issue of negligence before the jury. The first instance arose during argument on an objection by defense counsel to the question by plaintiff's counsel, "So, leaving it in gear is not a matter of negligence or carelessness?" During the colloquy, apparently in the hearing of the jury, defense counsel stated, "Since the record is clear, I think the complaint still on the issue is that Mr. Karasik is charging negligence." The record does not disclose at what point in tne proceedings the plaintiff dismissed the negligence counts against defendants, but the jury was not told that the negligence counts had been eliminated until just before they were instructed. We conclude that if negligence was in issue at the time of the remark, it was not improper (although the argument should have been conducted in a side bar conference), and if negligence was not in issue at that time, the remark was in response to a question by plaintiff's counsel on the issue and plaintiff cannot complain of an issue he introduced himself. (*Warp v. Whitmore* (1970), 123 Ill. App. 2d 157, 260 N.E.2d 45.) Similarly, the remarks of counsel for Howell in closing argument regarding the difference between contributory negligence and assumption of risk were in response to arguments by plaintiff's counsel that the negligence of the

defendants and the plaintiff was not to be considered by the jury. There was no objection made by plaintiff, the remarks did not misstate the law and we conclude that plaintiff was not prejudiced thereby.

Finally, plaintiff argues that he is entitled to a new trial because defendants "prejudicially disparaged" plaintiff's expert witness's qualifications in the presence of the jury. The first instance occurred when plaintiff's counsel, having completed his elicitation of Davis's professional qualifications, began to go into the merits of the evidence. Defense counsel requested an opportunity to question the witness concerning his qualifications to testify, stating: "At this point, Your Honor, I don't think he is qualified." Plaintiff's objection was sustained and the jury was instructed to disregard the statement. The second instance occurred when plaintiff's counsel asked Davis whether he had an opinion as to whether it was unreasonably dangerous to leave the transmission in reverse with the clutch disengaged. Defense counsel objected to the question on the basis that the witness was not qualified to render such an opinion because he had admitted never operating a bulldozer. The objection was overruled. The third instance occurred when plaintiff's counsel asked Davis how an operator mounts the TD-9. Defense counsel objected on the basis that Davis had no qualifications to testify to that fact.

■■■■■ Whether a witness is qualified to testify as an expert is within the sound discretion of the trial court. (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257.) But opposing counsel must raise the issue before the trial court in order to invoke the trial court's discretion and to preserve the issue for review. (*Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 340 N.E.2d 684.) Here, there was nothing improper in defendants' objections at the times they were made; in fact, as to the last described occurrence, when the witness testified as to the manner in which an operator mounts the TD-9 he described a technique markedly different from and more difficult than that which was utilized by plaintiff customarily and at the time of the accident.

In conclusion, we find that it was an abuse of discretion for the court to grant a new trial on the basis of the irregularities in the trial as alleged, and that the manifest weight of the evidence supported the jury verdict, whether resolved on the issue of the existence of a defect or on the issue of plaintiff's assumption of the risk. Our review of the record reveals that plaintiff was given a full and fair day in court, and the jury verdict should not have been disturbed. The order setting aside the jury verdict for defendants and granting a new trial is reversed and the cause is remanded with directions to enter judgment in favor of defendants on the verdict.

Reversed and remanded with directions.

GOLDBERG, P. J., and McGLOON, J., concur.