DEMETICA BUFORD, a Minor, by her Mother and Next Friend, Annie Buford, Plaintiff-Appellee and Appellant, v. THE CHICAGO HOUSING AUTHORITY, Defendant-Appellee (Otis Elevator Company, Defendant-Appellant).

First District (2nd Division)   No. 83—1914

Opinion filed February 11, 1985.

Gary S. Hokin, of Hokin & Melber, of Chicago (Sidney Z. Karasik, of counsel), for Demetica Buford.

McKenna, Storer, Rowe, White & Farrug, of Chicago (Robert S. Soderstrom, Charles P. Menges, James P. DeNardo, and Andrew Fylypovych, of counsel), for appellant Otis Elevator Company.

Orner, Wasserman & Moore, Ltd., of Chicago (Norton Wasserman and Esther Joy Schwartz, of counsel), for appellee Chicago Housing Authority.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendants Chicago Housing Authority (CHA) and Otis Elevator Company (Otis) liable in negligence for injuries sustained by plaintiff when she fell into an elevator shaft on CHA's property. The circuit court entered judgment on the verdict against Otis, granted CHA's motion for judgment notwithstanding the verdict, and set aside the jury's answer to a special interrogatory. Otis appeals from the judgment; plaintiff separately appeals from the judgment as to CHA setting aside the special finding and granting judgment *n.o.v.*

These appeals raise as issues whether the circuit court erred by: (1) denying Otis' motion for a new trial; (2) permitting plaintiff's witness to testify as an expert; (3) granting CHA's motion for judgment *n.o.v.*; (4) setting aside the jury's special finding; and (5) conditionally granting CHA's motion for a new trial.

On the afternoon of August 28, 1979, the 9-year-old, 90-pound plaintiff was standing beside the two elevators[1] on the first floor of the Rockwell Gardens CHA building at 2514 West Van Buren, in which she lived with her family. Plaintiff and a girl named Emma scuffled and Emma pushed plaintiff, who stumbled back and hit the

---

[1] One elevator, herein designated the "odd elevator," stops at odd-numbered floors; the other stops at even-numbered floors.

closed odd elevator door, the bottom of which pushed in. Plaintiff fell a distance of 15-16 feet to the bottom of the elevator shaft, and was taken to a hospital, having sustained a comminuted supracondylar fracture of the left humerus.

On December 12, 1980, plaintiff initiated the instant action, naming as defendants CHA (owner of the building), Otis (responsible for maintaining and repairing the elevators), and Westinghouse Electric Corporation (manufacturer of the elevator). The circuit court granted Westinghouse Electric Corporation's motion for summary judgment on June 26, 1981, which order is not involved in this appeal. The amended complaint, filed on June 7, 1983, named only CHA and Otis as defendants.

At trial, which began on June 8, 1983, plaintiff called an Otis elevator repairman, Wayne Sliger, as an adverse witness under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). Sliger, a "card mechanic," the highest level of competency below foreman, had been repairing elevators in Rockwell Gardens since 1968. In 1979, he reported to the Rockwell Gardens CHA office, where he picked up work order tickets designating the repairs he would then perform. Upon completion of a repair, he noted on the work ticket the problem found and the work performed. Both Otis and CHA personnel were thereby made aware of what he did and where he did it.

Sliger described a "gib" as a metal guide attached to the bottom of the elevator door which holds the door in a lengthwise slot in the doorsill, as the door travels back and forth upon opening and closing. Rockwell Gardens' elevator door gibs became disengaged from their sills at least once per week, which Sliger discussed with his supervisors at Otis. CHA supervisors may have mentioned it every so often and were aware of this recurring condition. A door disengaging from the gib slot would still hang parallel from top to bottom and the elevator would continue to operate. No warning device is triggered if a door is disengaged. There were no signs posted warning of this condition. Based on his experience, doors which have been disengaged at the bottom are easier to disengage thereafter. He generally repaired bent gibs by hammering them straight, sometimes straightening the same gib more than once. He was aware of the effects of metal fatigue, which depended on the degree of bend and the length of time the gib was in use. After repairing a door, he pushed on it with his hands to see if it would hold. He replaced gibs which he considered inadequate.

Sliger testified about the specific repairs he made during August

1979 to the subject odd elevator. On August 1, the door was "hanging" on the 11th floor, as the gib had been bent from force being applied to the door; he repaired the door by straightening the gib. On August 3, the first floor door was "off track" and the gibs bent; he straightened the gibs. On August 10, the door was off track on the 9th floor; he rehung the door. On August 18, he repaired the door lock contact on the 9th floor. On August 21, the first floor door was hanging by a single hanger and, as the shaft was exposed, had to be barricaded; he rehung the door, noting that two gibs were in place. On August 22, the same door had been kicked off again, and was off track with the gibs bent; after he straightened the gibs, the door was working perfectly. On August 23, the first floor door was working correctly. Sliger was on vacation when the subject accident occurred.

Al Blanton, an Otis "permit mechanic," testified that during 1978-79 he was Sliger's "helper," and was the repairman when Sliger was not at work. During Sliger's August 1979 vacation, Blanton worked on the subject odd elevator. On August 25, the elevator was out of order because a beer can had been jammed in the back of the elevator cab door on the 5th floor. On August 27, the 13th floor hatch door was off track. On August 28, he was told a child had fallen into the "pit" and the elevator needed repair. He found the first floor gibs "completely not usable," as they had been bent back and broken off. To be up to standard, a bent gib needed to be replaced with a new one. He would never attempt to reuse a gib, but would replace it with a new one, as the gibs alone keep the bottoms of the doors from falling in. Whether to reuse or replace a bent gib was left to the repairman's discretion, but he would always inform management of the condition of the gib.

Blanton was never taught about how much pressure an elevator door should withstand. He usually replaced bent gibs, because if a piece of steel is bent, it starts to lose strength and if it continues being bent, it gets weaker. The more gibs used, the more pressure the door could withstand. Although the doors were designed for use with one gib, a second gib was added at some point for strength. After he added three new gibs when repairing the elevator on the day following the accident, the doors were not kicked off again.

Ervin Sprull, also called by plaintiff as an adverse witness, had been the CHA janitor in charge of the subject building since 1972. Two persons comprise the normal janitorial staff per building. Elevators are cleaned daily. In the morning, the elevators are checked; any problems are reported to the CHA maintenance office. He customarily

walks from the first to the 13th floor, checking all elevator doors. Twice each morning and afternoon, janitors ride the elevators to pick up garbage at each floor. Elevator doors were frequently kicked in.

Dale Piechocki, a city of Chicago elevator inspector and card-holding elevator mechanic, testified for plaintiff. If a gib was bent, he would replace it with a new one; if a replacement were not immediately available, he would straighten and reinstall the damaged gib, but only if it appeared safe enough to run for an hour until a new gib could be secured. He would hesitate to straighten a gib because the metal would be fatigued. The more metal is bent, the greater are its, chances of breaking. He inspected the subject elevator door on August 29, 1979, and found it to have only one gib, which was in "passable" condition. He didn't know whether the same gib was on the door when the accident took place. A door not connected at its lower end by a gib would still operate. In his opinion, an elevator door which could not withstand the weight of a 90-pound girl's body pushing against it would be unsafe, although he was not permitted to consider this question with the hypothetical alternatives of a gib's being in place or not.

Also testifying for plaintiff was John Stilson, a safety and automobile consultant with B.S. and M.S. degrees in mechanical engineering. According to Stilson, gibs are used to provide proper tolerance and tightness of fit to prevent the particular part from moving too much out of plane. A gib which had been bent and then hammered straight would be out of specification and would not function to its intended purpose. While a hammered gib could still operate in its guiding fashion, its structural integrity and load carrying capability, as well as its endurance and durability, would definitely be deteriorated. He calculated the force generated by a 90-pound individual, pushed three to five feet, and was of the opinion that a door giving way to such force was improperly repaired or maintained, since the system, as originally designed, should have withstood the impact. On cross-examination, Stilson conceded that a "mild" bend could have been straightened without causing an accident.

Testifying for CHA was Cary Tucker, CHA janitor, who was on duty in the subject building when the incident occurred. He checked the elevators that morning, using them to go up and down. He used the first floor odd elevator door 30 minutes before the accident, and noticed nothing wrong. Immediately before the accident, he saw some girls playing in front of the elevator. One girl was pushed, her back hit the door which swung in, and she fell into the shaft. The door "swung freely" and made "no sound" when hit. There was an ongo-

ing problem at Rockwell Gardens involving elevator doors being kicked or pushed in. The people in Rockwell Gardens CHA office all know about this. He personally talked about the problem and how dangerous it was with the CHA head janitor and maintenance superintendent, who got Otis to fix it.

Lloyd Mason, who in August 1979 was Otis' superintendent of maintenance for CHA contracting, testified on behalf of Otis. Under its contract with CHA, Otis made "surveys" of each elevator at least once yearly. Surveys involved personal visits to check out the hoistways and all operating situations of the elevator. Gibs were checked during the surveys by inserting a pry bar under the doors to check for abnormal clearance. General maintenance was conducted semimonthly, with each visit entailing a different aspect of maintenance, which varied from visit to visit. Other repairs were made after CHA notified Otis of a problem; such repairs were authorized by means of a "time ticket." CHA paid for all such repairs not part of the maintenance contract. Otis' policy was that severely bent gibs were replaced; otherwise, they were straightened. The decision to replace or straighten a gib was left to the mechanic on the job. On cross-examination, Mason said that doors were never tested to see whether they could withstand pressure. There is no test known, other than visual inspection, to evaluate the damage to a gib. He had conversations with CHA personnel in charge of the elevators about the recurring vandalism, especially "about the many, many misuses of the door being kicked off."

After the close of evidence, the circuit court directed a verdict in CHA's favor on the issue of CHA's actual notice of the defective condition of the door. The jury then returned a verdict in favor of plaintiff and against CHA and Otis, assessing plaintiff's damages at $48,350; plaintiff was found not contributorily negligent. The jury answered yes to a special interrogatory which inquired: "Did the Chicago Housing Authority have constructive notice of any defect in the elevator door in question at the time of or shortly before this occurrence?"

The circuit court denied Otis' post-trial motions for judgment *n.o.v.*, for a new trial, and for remittitur, entering judgment for plaintiff. Similar motions were filed by CHA. The circuit court set aside the jury's answer to the special interrogatory as being against the manifest weight of the evidence; granted CHA's motion for judgment *n.o.v.*; and granted CHA's motion for a new trial on the condition that the judgment notwithstanding the verdict is reversed. These appeals followed.

I

Otis contends initially that the circuit court erred by denying its motion for a new trial, alleging that plaintiff failed to prove that Otis breached its duty of care. Otis argues that its contractual duty, requiring it to provide semimonthly maintenance and other repairs at CHA's request, was not shown to have been breached; and that there was no evidence adduced that the subject elevator, when last repaired prior to the accident, did not comply with applicable safety codes. Considerable evidence was presented, however, suggesting that the accident occurred because of Otis' failure, in light of repeated acts of vandalism resulting in damaged gibs, to use new gibs to repair the door, or to strengthen the doors with additional gibs. An Otis repairman testified that, although the decision to reuse a straightened gib, rather than install a new one, was left to his discretion, he also testified that where elevator doors previously have been disengaged at the bottom, as was the subject door, they are more easily disengaged thereafter; he had seen doors which had been kicked off "many times"; he was aware that the metal in gibs was subject to fatigue; and he tested a repaired door by pushing on it with his hands to see if it would hold. Other witnesses testified that bending and straightening gibs would subject them to metal fatigue and thereby weaken them structurally. Another Otis repairman indicated that he would hesitate to reuse a bent gib because of the risk of metal fatigue. A city elevator inspector noted that he would replace bent gibs with new ones, and would only reuse one temporarily until he could get a new gib.

■ A defendant's duty in a negligence case is to conform to the standard of reasonable conduct in light of the apparent risk. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 331, 211 N.E.2d 253, quoting Prosser on Torts 331 (3d ed. 1964); *Ortiz v. Warren Chevrolet, Inc.* (1974), 24 Ill. App. 3d 199, 201, 321 N.E.2d 77.) Here, the jury could have believed that Otis knew of the frequency with which the elevator doors were damaged, that gibs were subject to metal fatigue, and that the subject gibs had been bent and straightened at least twice prior to the accident and should have used new gibs in effecting such repairs. Other evidence suggested that the use of only one or two gibs was insufficient in view of the frequency of breakdown. A repairman stated that, following the accident, he installed three gibs in the subject door, after which he believed no further breakdowns took place. He asserted that the more gibs that were used, the more pressure the door could withstand; yet, the decision to use three gibs was not made until after the instant ac-

cident.

Otis further insists that a new trial should have been granted in the absence of evidence that the accident was caused by its negligence, rather than by an intervening and independent act of vandalism, which Otis had no authority to control or prevent. Otis bases this contention on evidence showing that: nothing appeared wrong with the door only 30 minutes before the accident; the door "swung freely" and made "no sound" when plaintiff fell against it; and no evidence showed the gib to be in place when the accident occurred. Plaintiff's theory of Otis' negligence, that Otis negligently repaired and maintained the elevator doors so that they were susceptible to an unsafe condition and disrepair, was supported by a preponderance of the evidence. The fact that vandals may have pushed in the door again before the accident was contemplated in plaintiff's theory, since if properly repaired or replaced, the gibs would not easily have given way in any event. The circuit court standard in determining a motion for a new trial is the preponderance of the evidence. The standard to be used by a reviewing court in determining the correctness of a circuit court's ruling on a motion for a new trial is whether or not the trial court abused its discretion or its ruling was against the manifest weight of the evidence. (*Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 144, 357 N.E.2d 500; *Martinet v. International Harvester Co.* (1977), 53 Ill. App. 3d 213, 221-22, 368 N.E.2d 496, *appeal denied* (1978), 67 Ill. 2d 592; *Ryon v. Javior* (1979), 69 Ill. App. 3d 946, 387 N.E.2d 936, *appeal denied* (1979), 79 Ill. 2d 618.) Denial of Otis' motion for a new trial under the foregoing circumstances was not error and must be affirmed.

## II

Otis maintains next that the circuit court committed reversible error by allowing plaintiff's witness, John Stilson, to testify as an expert concerning elevator safety. The qualification of a witness as an expert is within the sound discretion of the circuit court. (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257.) An expert is properly qualified where: (1) his opinion relates to a science, profession, business, or occupation and is beyond the knowledge or experience of the average juror; (2) he has sufficient skill, knowledge or experience so that his opinion will aid the trier of fact; and (3) the state of the art or scientific knowledge permits a reasonable opinion to be asserted by an expert. (*First National Bank v. Sousanes* (1981), 96 Ill. App. 3d 1047, 1054, 422 N.E.2d 188.) Otis contends that Stilson possessed no "special knowledge" concerning el-

evators, entitling him to render an expert opinion on the matter, in that he had: no prior knowledge or experience with elevator design, maintenance, repair, or installation; no prior experience with applicable safety codes; no familiarity with union requirements respecting elevator mechanics; no familiarity with the day-to-day practices of elevator mechanics; and had neither seen nor tested an elevator door gib, citing *Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 365 N.E.2d 1034, *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 385 N.E.2d 376, *Galindo v. Riddell, Inc.* (1982), 107 Ill. App. 3d 139, 437 N.E.2d 376, and *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 438 N.E.2d 1217.

■ Plaintiff contends, however, that Stilson was never held out to be an "elevator expert," but an expert in mechanical engineering and safety, whose expertise specifically addressed the matters of metal fatigue and its effect on supported structures. Stilson testified that he was employed as a safety and automobile consultant; had B.S. and M.S. degrees in mechanical engineering; took courses in strengths of metals, metallurgy, and construction integrity, the capacity of a member to sustain a given load without failure; and studied the concepts of force, pressure, and speed in courses in engineering mechanics and physics. While acknowledging that he had never previously studied elevator design, he said that elevators are constructed of components with which he was familiar. Stilson then testified to the metal fatigue resulting when a bent gib is repeatedly hammered straight. He also responded to a hypothetical question requiring a calculation of the force generated when a 90-pound person is pushed against an elevator door.

A foundation for his opinions was established by his familiarity with metals and metal fatigue, and his knowledge of the basic concepts required in answering the hypothetical question. Unlike the "expert" in *Galindo v. Riddell, Inc.* (1982), 107 Ill. App. 3d 139, 437 N.E.2d 376, plaintiff here demonstrated how Stilson's engineering background was applied to the problem at issue. And, unlike the witness in *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 438 N.E.2d 1217, Stilson did not testify to the defective design of a device with which he was unfamiliar; here, he testified to the effects of metal fatigue—a subject within his field of expertise—on a mechanical system the components of which he said he had studied. His lack of prior familiarity with elevators in particular, under the circumstances, goes to the weight of his testimony, not its competency. *City of Chicago v. Bank of Ravenswood* (1981), 93 Ill. App. 3d 52, 55,

416 N.E.2d 1115.

Otis urges further that the hypothetical question asked of Stilson should have been stricken. In essence, Stilson was asked whether, in his opinion, a closed elevator door with two bent and restraightened gibs was in a safe operating condition, where it was caused to move inward by the impact of a 90-pound person pushed against it. Otis argues that, because it had not been shown that the gibs were in their lower track at the time of the accident, the inclusion of this fact in the question was prejudicial. Generally, when an expert is asked to assume certain things as true, they must be within the realm of direct or circumstantial evidence, supportable by the facts or reasonable inferences which can be drawn therefrom. (*Smith's Transfer Corp. v. Industrial Com.* (1979), 76 Ill. 2d 338, 350, 392 N.E.2d 14.) Nevertheless, expert testimony couched in terms of probabilities or possibilities based on assumed facts is not inadmissible or improper. (*Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504; *Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 517-18, 388 N.E.2d 844; *Nicholas v. City of Alton* (1982), 107 Ill. App. 3d 404, 407-08, 437 N.E.2d 757.) Stilson's testimony, therefore, was properly admitted. Here, although there was no direct or unequivocal evidence that the gibs were in place at the time of the accident, such a determination, properly one for the jury, would be consistent with the evidence adduced. The circuit court properly permitted Stilson to assume that they were in place for the purpose of the hypothetical question. We find no error here.

## III

In plaintiff's appeal, she argues that the circuit court erred in granting judgment *n.o.v.* to CHA because it could find no basis in the evidence to support the jury's findings with regard to constructive notice of the condition of the elevator doors. CHA's tort liability is grounded in the Local Governmental and Governmental Employees Tort Immunity Act (Act), section 3—102(a) of which provides that a public entity, such as CHA, has a duty to maintain its property in a reasonably safe condition and is not liable for injury unless it has actual or constructive notice of the existence of a condition that is not reasonably safe in sufficient time prior to an injury to have taken remedial or protective measures. (Ill. Rev. Stat. 1983, ch. 85, par. 3—102(a).) The question of constructive notice is generally one of fact; it becomes a question of law, and thereby amenable to judgment *n.o.v.*, if all of the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors the defendant public entity that no

contrary finding based on that evidence could ever stand. (*Cook v. Gould* (1982), 109 Ill. App. 3d 311, 316, 440 N.E.2d 448; *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004, 1008, 276 N.E.2d 470; see also *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) The burden of proving notice is on the party charging it. (*Reed v. Eastin* (1942), 379 Ill. 586, 592, 41 N.E.2d 765; *Brown Bag Co. v. Bituminous Casualty Corp.* (1969), 117 Ill. App. 2d 287, 291, 254 N.E.2d 577.) Under section 3—102(a), constructive notice is established where a condition has existed for such a length of time, or was so conspicuous, that authorities, by exercising reasonable care and diligence, might have known of it. *Cook v. Gould* (1982), 109 Ill. App. 3d 311, 440 N.E.2d 448; *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004, 276 N.E.2d 470.

Plaintiff contends CHA was shown to have been on notice, through the work authorization tickets returned to CHA by Otis mechanics, as to the nature of the repairs made. Therefore, CHA knew that gibs which had been bent and reshaped at least two times had been reinstalled in the subject elevator door. CHA was also aware that this particular door was frequently off-track, and that, consequently, CHA should reasonably have inquired whether the use of reshaped gibs or of one or two gibs was sufficient, especially in view of the ongoing vandalism problem. Where one is on notice of facts which would put a prudent man on inquiry, he is chargeable with other facts discoverable by diligent inquiry, as "every unusual circumstance is a ground of suspicion and demands investigation." (*Reed v. Eastin* (1942), 379 Ill. 586, 41 N.E.2d 765; see also *In re Application of County Collector* (1977), 48 Ill. App. 3d 572, 588, 362 N.E.2d 1335.) Moreover, plaintiff asserts, CHA was charged with the higher duty of a common carrier in operating its elevators and, as such, was not absolved of its liability by delegating elevator maintenance to Otis, citing *Stewart v. Beegun* (1970), 126 Ill. App. 2d 120, 127, 261 N.E.2d 491.

CHA, however, urges that the defective condition did not exist for such a length of time as to have been reasonably discoverable. The door was observed to be working properly on the day prior to the accident by an Otis mechanic; a CHA janitor used the door only 30 minutes before. CHA cites cases involving section 3—102(a) liability in which trial courts properly found constructive notice absent where dangerous conditions were in existence longer than 30 minutes. (See *Cook v. Gould* (1982), 109 Ill. App. 3d 311, 440 N.E.2d 448; *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004, 276 N.E.2d 470.) CHA's contention—and the circuit court's rejection of the jury's

verdict—apparently presumes that the door failure was attributable to an act of vandalism which took place within 30 minutes of the accident and thus could not have been detected except by constant surveillance. In granting judgment *n.o.v.*, the court specifically noted that the elevator had been used 30 minutes before the accident. This view of the facts ignores the thrust of plaintiff's case, which premises liability on the structural failure of reshaped gibs, or an inadequate number of gibs, to withstand the force generated when plaintiff was pushed against the door. The court's acceptance of the verdict assigning liability to Otis was based precisely on this theory.

Furthermore, constructive notice could have been attributed to CHA even if the accident were caused by vandalism, since it knew of this recurring and dangerous situation, yet failed to take reasonable measures to protect persons on the premises. A jury could have concluded from the evidence that CHA knew, or should have known, that elevator doors were frequently disengaged from the bottom sills; that such doors hung parallel, top to bottom, so that their defective condition was not readily observable; and that such doors continued to operate. Under such circumstances, CHA reasonably should have warned of the potential danger, yet no warnings were posted. CHA correctly observes that vandalism, as a criminal act by a third person, is not a "condition of the premises" (see *Smith v. Chicago Housing Authority* (1976), 36 Ill. App. 3d 967, 971, 344 N.E.2d 536); however, the regular recurrence of the same type of vandalism involving the same elevator rendered subsequent such acts foreseeable and imposed a duty on CHA to take steps to prevent or control the vandalism, or at least to warn of the dangerous situation such acts potentially created (see *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 556, 340 N.E.2d 47).

■■■ CHA asserts nevertheless that it proved that it maintained a "reasonably adequate" inspection system and thereby established the absence of constructive notice under section 3—102(b) of the Act, which provides that a governmental entity does not have constructive notice of a dangerous condition if it establishes that either:

"(1) The existence of the condition and its character of not being reasonably safe would not have been discovered by an inspection system that was reasonably adequate considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for

uses that the public entity actually knew others were making of the public property or adjacent property; or

(2) The public entity maintained and operated such an inspection system with due care and did not discover the condition." Ill. Rev. Stat. 1983, ch. 85, par. 3—102(b).

Assuming that the accident was due to the failure of the reshaped gibs to withstand the impact of plaintiff's body against the door, the question is whether CHA's inspection system was "reasonably adequate," under the circumstances, to discover the defect. CHA personnel testified that elevators are checked regularly by janitors who ride them at least four times daily while they gather refuse from each floor. Such inspections, however, only determine whether the elevators go up and down and whether the doors open properly. Although CHA itself conducts no further testing, at the time of the incident CHA was party to a contract with Otis, under which Otis conducted yearly "surveys" of all CHA elevators. Such surveys evaluated "all operating situations of the elevator." Gibs were checked during such surveys by the insertion of a pry bar under the doors to look for "abnormal clearance." In addition, semimonthly maintenance visits were conducted by Otis; each such visit focused on a different aspect of maintenance. There were no specific tests conducted, however, to determine whether the doors could withstand pressure. Otis was also responsible for repairing elevators upon authorization by CHA. An Otis mechanic testified that he checked a repaired door by applying pressure on it with his hands "to see if it's going to hold." Although Otis' superintendent of maintenance was unaware of any test, other than visual inspection, to evaluate the damaged gib, Stilson, plaintiff's expert, noted that a "Shitillian force gauge" can be used to field test the door for structural fatigue. Throughout this time, moreover, CHA was aware of the ongoing vandalism of the doors and, through its repair tickets, aware of the means by which the gibs were repaired.

In light of the balancing test posited in section 3—102(b)(1), neither CHA's own "inspection" program, nor the program conducted by Otis on CHA's behalf, was adequate to discover the defect. If, as Otis' superintendent stated, visual inspection by an experienced mechanic was the only means whereby a reshaped gib could be evaluated, the "inspection system" would have satisfied section 3—102(b). Testimony regarding the "Shitillian force gauge," however, cast some doubt on the adequacy of this method. While plaintiff did not show the expense entailed in using this device, the burden of establishing the reasonableness of an inspection system under section 3—102(b) rests with the public entity. CHA did not rebut plaintiff's assertions or attempt

to show that the use of such an instrument would not be feasible. CHA contends that such a device would require the removal of a door being tested; however, this contradicts the testimony presented at trial. CHA also urges that such removal of the doors on a regular basis by CHA janitors would involve an unreasonable burden, but Stilson's testimony regarding the device suggested that it would be used to field test the strength of reshaped gibs at the time of their repair, not on a regularly scheduled basis.

There was sufficient evidence to support both Otis' and CHA's negligence on a consistent theory of liability. Accordingly, the circuit court erred in having granted judgment *n.o.v.* to CHA, which must be reversed.

## IV

■■■ Plaintiff also assigns error to the circuit court's rejection of the jury's answer to the special interrogatory, which found that CHA had constructive notice of the door defect at the time of or shortly before the occurrence. An answer to a special interrogatory may not be set aside unless it is contrary to the manifest weight of the evidence or conflicts with a general verdict. (*Freeman v. Chicago Transit Authority* (1965), 33 Ill. 2d 103, 106, 210 N.E.2d 191; *Prange v. Wallenburg* (1975), 27 Ill. App. 3d 618, 622, 327 N.E.2d 450.) The jury's general verdict in the present case did not conflict with its answer to the special interrogatory. Plaintiff's theory of liability was premised upon CHA's constructive notice of Otis' use of weakened gibs or, alternatively, an inadequate number of gibs; it cannot be said that a conclusion opposite to that reached by the jury was evident. The circuit court erred, therefore, in setting aside the jury's answer.

## V

■■■ ■ The circuit court, in setting aside the jury's special finding and in granting judgment *n.o.v.*, ordered CHA's motion for a new trial to be granted on the condition that the judgment *n.o.v.* is reversed. CHA contends that, under Supreme Court Rule 341(e)(7), plaintiff has waived her objections to this conditional ruling by failing to include it in her notice of appeal or to raise the issue in her brief. (87 Ill. 2d R. 341(e)(7); *Rubright v. Codman & Shurtleff* (1980), 86 Ill. App. 3d 94, 101, 407 N.E.2d 681.) Plaintiff counters that the issue was not waived because, in both her notice of appeal and initial brief, she sought relief—entry of judgment on the jury's verdict and special answer—which would preclude a new trial. We agree. The preponderance of the evidence standard is to be applied by the circuit court in

considering a motion for a new trial. (*Martinet v. International Harvester Co.* (1977), 53 Ill. App. 3d 213; *Ryon v. Javior* (1979), 69 Ill. App. 3d 946, 951; *Spankroy v. Alesky* (1977), 45 Ill. App. 3d 432, 439, 359 N.E.2d 1078.) The discretion of a trial court in conditionally granting a new trial must be given the same consideration as when a new trial is granted unconditionally. (*Prange v. Wallenburg* (1975), 27 Ill. App. 3d 618, 626.) As previously noted, plaintiff sustained her burden of proving CHA's negligence with a preponderance of the evidence; furthermore, as the circuit court's ruling was against the manifest weight of the evidence, it abused its discretion by granting CHA a new trial under this posture of the case. The judgment granting CHA a new trial must be reversed.

The judgments are therefore affirmed in part and reversed in part.

Affirmed in part; reversed in part.

PERLIN and BILANDIC[2], JJ., concur.

---
[2]Judge Downing heard the oral argument in this case and, following Judge Downing's retirement, Judge Bilandic was substituted, listened to the tapes of the oral argument, read the briefs and record and concurs in the opinion.