2019 IL App (4th) 180662

FILED
October 4, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JOHN E. MURPHY, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE SPRINGFIELD PARK DISTRICT, a Municipal | ) | No. 16L178 |
| Corporation, and DEREK HARMS, | ) | |
| Defendants-Appellees. | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1      In January 2017, plaintiff, John E. Murphy, filed an amended complaint against defendants, the Springfield Park District and Derek Harms, the executive director of the Springfield Park District (collectively, the Park District), alleging that they willfully and wantonly permitted a dangerous condition to exist on one of the Park District's bike paths that caused a serious injury to Murphy. Specifically, Murphy alleged that, in August 2015, he was riding his bike on a bike path when he struck a round, metal collar designed to hold a steel bollard, which was in the middle of the path. Murphy claimed the Park District had removed or permitted the removal of the bollard, causing the dangerous condition.

¶ 2      In April 2018, the Park District filed a motion for summary judgment in which it argued the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/1-101 *et seq.* (West 2014)) barred liability for the action. The Park District contended

there was no genuine issue of material fact that (1) it did not have actual or constructive notice of an unsafe condition (see *id.* § 3-102(a)) and (2) it did not engage in willful or wanton conduct (see *id.* § 3-106). Murphy filed a response in which he argued the case should be presented to a jury. In September 2018, the trial court agreed with both of the Park District's arguments and entered summary judgment in its favor.

¶ 3        Murphy appeals, arguing the trial court erred by entering summary judgment in favor of the Park District. We disagree and affirm.

¶ 4                                I. BACKGROUND

¶ 5                                A. Murphy's Claims

¶ 6        In January 2017, Murphy filed an amended complaint against the Park District. The complaint alleged that, in August 2015, Murphy was riding his bicycle on the "Interurban Trail," a bike path on and along an abandoned railroad line maintained by the Park District that runs through parts of Springfield, Illinois, and the surrounding area. At around 4 p.m., Murphy rode under a railroad trestle and struck a hidden obstruction in the path. Murphy was thrown from his bike and sustained a concussion, broken bones, and permanent injuries.

¶ 7        The complaint also alleged that the Park District "installed and maintained traffic obstruction bollards" (essentially steel posts) at the location of the accident. One bollard had been removed, "leaving a several inch obstruction in the center of the bike trail." It was this obstruction that Murphy hit.

¶ 8        Murphy alleged the Park District engaged in willful and wanton conduct by, among other things, (1) intentionally removing or permitting the removal of the bollard and (2) knowing of and permitting "the creation of the unreasonably dangerous condition of the bollard flange in conscious disregard for the safety of Plaintiff." Count II of the complaint

alleged essentially the same willful and wanton conduct against Derek Harms, the executive director of the Park District who was responsible for maintenance of the trail.

¶ 9                              B. The Park District's Motion for Summary Judgment

¶ 10          In April 2018, the Park District filed a motion for summary judgment in which it argued various provisions of the Act barred liability for the action. Relevant to this appeal, the Park District first contended that there was no genuine issue of material fact that it did not have actual or constructive notice of a dangerous condition (the missing bollard) in reasonably adequate time prior to Murphy's accident. See *id.* § 3-102(a). Second, section 3-106 of the Act provides that, if an injury occurs because of a condition on recreational property, a public entity or its employee is liable only if it engaged in willful and wanton conduct. *Id.* § 3-106. The Park District asserted that Murphy could not meet the willful and wanton standard.

¶ 11                                  1. *The Undisputed Material Facts*

¶ 12          In support of its motion, the Park District attached the depositions of Murphy and Park District employees Jason Graham, Nicholas Blasko, Derek Harms, and Elliott McKinley. We note that, in his response, Murphy relied upon the same depositions and did not provide any additional depositions or affidavits.

¶ 13                                  a. Murphy's Deposition

¶ 14          Murphy testified that he rode his bike on the Interurban Trail on August 24, 2015. At about 3:15 p.m., Murphy rode north under the railroad trestle, where the accident would later occur, and did not notice anything was amiss. He had ridden the trail before and was aware that there were three steel bollards near the railroad trestle. About 45 minutes later, when Murphy was returning south, he passed under the same railroad trestle and suddenly saw the steel collar that holds the bollard in place. Because the collar was 2 to 3 inches in front of his tire and

Murphy was travelling about 10 miles per hour, he could not avoid the collar.

¶ 15        Murphy testified he struck the collar and was thrown from his bike. The next thing he remembered was waking up in the emergency room with a concussion, a broken nose, and two broken teeth. He also suffered lacerations on his lips, one of which resulted in permanent nerve damage and numbness to the left side of his mouth.

¶ 16        Murphy testified that he had ridden the trail for years and had never noticed a bollard being down. He was also unaware of any accidents involving a missing bollard. Murphy admitted that he did not know how long the bollard that caused his accident had been removed or who removed it. Murphy agreed the bollard could have been removed just minutes before the accident.

¶ 17        Murphy stated he recalled that, when he initially rode under the trestle heading north, the grass on both sides of the trail had been mowed and he heard machinery, so he thought the Park District could have been mowing and removed the bollard. However, Murphy agreed (1) he never saw a work crew, (2) he did not know if the machinery he heard was a lawn mower, and (3) he did not know what machinery was being used or who was using it. Accordingly, Murphy agreed that "it would be a matter of guess and speculation to say that a work crew member had removed the bollard and the location of [his] accident."

¶ 18                                    b. Jason Graham

¶ 19        Jason Graham testified he was the assistant superintendent of park maintenance at the time of the accident and had worked for the Park District since 2010. Graham oversaw about 35 employees, whom he split up into five-man maintenance crews with each assigned to a geographic area. Graham would assign them daily tasks including mowing, checking trails to make sure they are clear, and making repairs.

¶ 20          Graham stated there were 10 to 11 bollards on the Interurban Trail, usually in groups of 3 with the middle bollard being removable. The bollards were designed to prevent motor vehicles from accessing the trail. Graham explained a removable bollard is held in place by a steel collar and a large metal pin with a padlock on it. The pin has two holes, one on each end, and locks are placed on each side to secure the pin. Graham stated the Park District uses one lock and a different entity, such as the county or city, places the other lock. The removable bollard sits inside the collar, which is "several inches" high. The bollards also have steel handles to assist with removal and weigh about 15 pounds.

¶ 21          Graham further testified that occasionally maintenance crews need to remove a bollard to get a piece of equipment on to the trail. They are taught to remove the bollard, drive the vehicle through, and then immediately replace the bollard. Graham had never heard of or seen anyone not follow this procedure. To his knowledge, a Park District employee did not remove the bollard on the day in question, and he was never even told it was missing.

¶ 22          Graham testified that, for a busy time such as August, his crews would be out on the trail several times a week. They are trained to look for missing bollards and to make sure bollards have working pins and locks. If a pin was missing, the crew often had a replacement on the truck, or they would get one fabricated as soon as possible, usually "in an hour or two," but they "would never let a pin sit out of it for three or four days." Graham estimated that crews encountered a bollard that had been removed and not put back between 1 and 10 times a year. He estimated cut locks were found three to five times per year, and the same was likely true for pins. Crews were trained to immediately locate, replace, and secure a missing bollard. Graham had never heard a complaint about the bollards or of an accident involving the bollards. Graham stated that other persons accessed the trails and removed the bollards, including "emergency

service[s]," "Wright Tree Service, Nelson, Ameren, those type of bodies have been on the trail."

¶ 23                              c. Nicholas Blasko

¶ 24        Nicholas Blasko testified he was the maintenance foreman in charge of "area three," where the accident occurred, and had been in that position for five years. With regard to the Interurban Trail, Blasko had a four- to five-man crew during the summer, and the crew would perform duties such as mowing, weeding, tree trimming, blowing off the trail, painting, checking for damage, and inspecting bollards. Blasko stated they mowed the trail "[a]t least once a week."

¶ 25        When Blasko encountered a bollard with a missing pin or lock, he would immediately replace it. Blasko stated he had a large supply of pins and locks in his truck. Blasko stated that, if he needed to get his vehicle or equipment on the trail, he was trained to remove the bollard, drive his vehicle through, and replace the bollard before proceeding any further. Blasko had never seen anyone on his crew fail to follow the described procedure or not replace a bollard immediately.

¶ 26        Blasko testified he encountered a missing bollard two to three times a year. He was always able to locate the bollard and properly secure it in place with a new pin or lock if needed. Blasko stated some pins have two holes while others have one. If he ever did not have a lock, he would place a bolt, secured with a nut and lock washer, in the other side of the pin to prevent its removal. He would later replace that bolt with a lock.

¶ 27        Blasko agreed that any person with a wrench and ratchet set could remove the nut and bolt. Three or four times a year, Blasko would see a pin that had been removed that had previously been held in place with a bolt instead of a lock.

¶ 28        Other people who removed the bollards included Nelson Tree Service, the City of Springfield, Ameren, AT&T, EMS, and the railroad. Blasko also agreed that vandals could snap

off the locks. Blasko stated the railroad cut the locks to gain access. He did not know how other parties gained access. When secured with the pin, bollards can only be put in one way—that is, with the handles parallel to bike traffic. If the pin is removed, the bollard can be moved. If the handles on a bollard are not parallel to the path, it is not secured by a pin. Blasko stated he had replaced the pin on the bollard in question fewer than five times.

¶ 29       Blasko testified that, other than Murphy's case, he had never heard any complaints about any of the bollards or accidents caused by their removal. He had heard of one accident involving a woman hitting a bollard that was in place but did not know any other details. Blasko stated he did not know who removed the bollard on the day of the accident and to his knowledge no one at the Park District removed it.

¶ 30                            d. Derek Harms

¶ 31       Harms was the executive director of the Park District. He testified that the Park District had five bike trails, containing about 20 miles of trails, with "multiple, multiple bollards." Harms explained that the bollards are a safety feature designed to prevent vehicular traffic from accessing the trail. Harms stated that he believed utilities or emergency services could gain access by cutting locks and that vandals had done so in the past. Harms stated the Park District does not permit people to remove bollards and gain access to the trails. He had never received a phone call about permitting access. The Park District does not give anyone other than its employees keys to the locks on the bollards.

¶ 32       Harms testified the Park District was aware of two other incidents involving bollards. He received an e-mail from a woman in 2013 who stated she ran into a bollard with her bike and had significant injuries. There was no indication that the bollard was out of place or not functioning as intended. In 2005, a man e-mailed the Park District to warn that the handles of the

bollards were perpendicular to the flow of traffic and riders could hit them. The man suggested simply rotating the handles 90 degrees. Harms testified that "there was somebody that had a good idea to put [the handles] parallel. It is my understanding that that's what happened." Harms was not aware of any other accidents involving bollards and was not aware of any accidents similar to Murphy's. Harms stated that staff is trained to routinely inspect bollards any time they encounter them. Harms denied that the Park District or any of its employees removed the bollard and stated he did not know who did.

¶ 33                                  e. Elliot McKinley

¶ 34          Elliot McKinley testified he was the director of parks and planning with the Park District, where he oversaw maintenance operations. He had been in that position for 12 years. He stated the Park District had verbal agreements with some utilities in the past to access trails when necessary. He stated none were in place in August 2015. McKinley also stated the Park District investigated Murphy's accident and could not determine who removed the bollard. McKinley was aware of just one other accident involving bollards—the September 2013 incident Harms described—and no accidents similar to Murphy's.

¶ 35                          2. *The Park District's Arguments*

¶ 36          The Park District argued section 3-102 of the Act required Murphy to prove that it had actual or constructive notice of a dangerous condition "in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." *Id.* § 3-102(a). The Park District argued Murphy could not demonstrate that it had actual or constructive notice that the bollard at issue had been removed. The Park District contended that none of its employees removed the bollard or permitted someone else to do so. Further, the Park District did not have notice that the bollard was removed, and Murphy admitted the bollard could have been

- 8 -

removed mere minutes before the accident, well before the Park District could have remedied the problem.

¶ 37 Alternatively, the Park District argued that Murphy could not demonstrate it engaged in willful and wanton conduct as required by section 3-106 of the Act. *Id.* § 3-106. The Park District asserted that it was never made aware of a dangerous condition and had no knowledge of any previous accidents or injuries caused by the bollard's being removed. Therefore, according to the Park District, no genuine issue of material fact existed that the Park District did not act in conscious disregard of the safety of others.

¶ 38 3. *Murphy's Arguments*

¶ 39 Murphy argued that the collar itself was the dangerous condition and all of the Park District's employees testified that they were aware (1) the collar stuck up four to five inches in the middle of the path, (2) third parties repeatedly removed bollards and did not replace them, and (3) vandals could snap the locks off. Murphy also noted that two other people had written to the Park District informing them of accidents with the bollards or other dangerous conditions of the bollards. Murphy contended that the repeated vandalism gave the Park District constructive notice of the dangerous condition. Murphy further asserted that, because the Park District failed to warn of or prevent the vandalism, it had acted with deliberate indifference to others' safety.

¶ 40 C. The Trial Court's Ruling

¶ 41 In September 2018, the trial court made a lengthy docket entry setting forth its ruling. The court granted summary judgment in favor of the Park District on multiple grounds. First, the court found Murphy failed to establish a genuine issue of material fact as to actual or constructive notice. The court stated "no evidence has been presented to show that the Springfield Park District had any knowledge of injuries incurred by bicycle trail users that had

resulted from the removal of any bollards anywhere on the park district's 20 miles of biking trails." The court noted that, "at best," Murphy had demonstrated that the Park District was on notice that bollards were sometimes removed by third parties, but it was never informed of any inherent risks or injuries relating to such conduct. The court found that the Park District was entitled to summary judgment because Murphy had not demonstrated the notice required by section 3-102 of the Act.

¶ 42 Second, the trial court found Murphy also failed to demonstrate a genuine issue of material fact concerning willful and wanton conduct. The court explained that Murphy's claims were covered by section 3-106 of the Act because the bike path was recreational property. However, because the Park District had no knowledge of a dangerous condition or prior accidents, no jury could conclude it acted in a willful or wanton manner.

¶ 43 This appeal followed.

¶ 44        II. ANALYSIS

¶ 45 Murphy appeals, arguing the trial court erred by entering summary judgment in favor of the Park District. We disagree and affirm.

¶ 46    A. Section 3-102 of the Act Does Not Apply in This Case

¶ 47 We note that the parties devote much of their briefs to the issue of whether the Park District had actual or constructive notice of a dangerous condition on the bike path. Presumably, the parties do so because they believe section 3-102 of the Act plays a role in this case. See *id.* § 3-102(a); see also *Monson v. City of Danville*, 2018 IL 122486, ¶ 24, 115 N.E.3d 81 ("[S]ection 3-102(a) *** codifies the common-law duty of a local public entity to maintain its property in a reasonably safe condition."). Thus, Murphy argues that the raised collar was itself a dangerous condition and the Park District was on notice of the defect. Further, Murphy contends

the Park District was on notice of the repeated vandalism that resulted in missing or unsecured bollards.

¶ 48    In response, the Park District focuses on the specific bollard in this case and asserts that it had no notice that the bollard was missing or unsecured prior to Murphy's accident. The Park District also notes that Murphy conceded in his deposition that the bollard could have been removed mere minutes before his accident.

¶ 49    However, Murphy's contentions regarding section 3-102 of the Act (as well as the Park District's response) are beside the point because that section does not apply under the facts of this case. Section 3-102(a) provides, "*Except as otherwise provided in this Article*, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition ***." (Emphasis added.) 745 ILCS 10/3-102(a) (West 2014). Section 3-106 provides otherwise when the property in question is recreational property. A public entity is liable for injuries occurring on its recreational property only if it is guilty of willful and wanton conduct proximately causing such injuries. *Id.* § 3-106. Accordingly, when no dispute exists concerning the recreational nature of the property, section 3-106, and not section 3-102, governs whether the public entity is liable. See *Dunbar v. Latting*, 250 Ill. App. 3d 786, 791-92, 621 N.E.2d 232, 236-37 (1993).

¶ 50    We note that Murphy specifically pleaded the Park District acted willfully and wantonly in both counts of his complaint, and he does not argue that the bike path at issue was anything other than recreational property. Indeed, at oral argument, Murphy conceded the bike path was recreational property. Because the parties agree that the injury occurred on recreational property, section 3-106 governs whether the Park District may be liable, and section 3-102 is not relevant to the analysis. Thus, we need not address the issue of notice under section 3-102.

¶ 51       Because section 3-106 applies to Murphy's claims, regardless of any issue of notice under section 3-102, Murphy was required to demonstrate that a jury could find the Park District acted in a willful and wanton manner to withstand summary judgment. (As we later explain, under section 3-106, the issue of notice is relevant only as it relates to whether the public entity engaged in willful and wanton conduct.) Because we conclude that the trial court, when granting summary judgment for the Park District, correctly found no genuine issue of material fact as to willful and wanton conduct, we need address only this ground.

¶ 52                    B. Section 3-106 of the Act Does Apply in This Case

¶ 53                    1. *Standard of Review: Motions for Summary Judgment*

¶ 54       Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson*, 2018 IL 122486, ¶ 12. When examining whether a genuine issue of material fact exists, a court construes the evidence in the light most favorable to the nonmoving party and strictly against the moving party. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22.

¶ 55       "Summary judgment is a drastic means of disposing of litigation and 'should be allowed only when the right of the moving party is clear and free from doubt.' " *Id.* (quoting *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43, 809 N.E.2d 1248, 1256 (2004)). Although a nonmoving party "is not required to prove his or her case, the nonmovant must present a factual basis arguably entitling that party to a judgment." *Horwitz v. Holabird & Root*, 212 Ill. 2d

1, 8, 816 N.E.2d 272, 276 (2004). "A party opposing a motion for summary judgment cannot rest on its pleadings if the other side has supplied uncontradicted facts that would warrant judgment in its favor [citation], and unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact [citation]." *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20, 52 N.E.3d 319. A trial court's entry of summary judgment is reviewed *de novo*. *Monson*, 2018 IL 122486, ¶ 12.

¶ 56        2. *Claims Involving Recreational Property: Willful and Wanton Conduct*

¶ 57        Section 3-106 of the Act states as follows:

> "Neither a local public entity nor a public employee is liable for an injury where the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes, including but not limited to parks, *** unless such local entity or public employee is guilty of willful and wanton conduct proximately causing such injury." 745 ILCS 10/3-106 (West 2014).

¶ 58        Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* § 1-210. "Willful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." (Internal quotation marks omitted.) *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 448, 593 N.E.2d 522, 530 (1992).

¶ 59        The Third District eloquently explained when a public entity may be found to have engaged in willful and wanton conduct as follows:

- 13 -

"Willful and wanton conduct may be found to exist where the local public entity takes no action to correct a condition even though it was informed about the dangerous condition and knew that other persons had previously been injured because of the dangerous condition. [See *Straub v. City of Mt. Olive*, 240 Ill. App. 3d 967, 979-80, 607 N.E.2d 672, 680-81(1993).] Also, a local public entity may be found to have engaged in willful and wanton conduct when it intentionally removes a safety feature from its recreational property. [See *Benhart v. Rockford Park District*, 218 Ill. App. 3d 554, 559-60, 578 N.E.2d 600, 603-04 (1991).] However, where there are no facts or allegations to show that the local public entity engaged in any intentional act or knew of other injuries or accidents caused by the allegedly dangerous condition, the conduct of the local public entity does not rise to the level of willful and wanton conduct. [See *Brown v. Chicago Park District*, 220 Ill. App. 3d 940, 944-45, 581 N.E.2d 355, 359 (1991)]." *Dunbar*, 250 Ill. App. 3d at 792.

¶ 60 Whether conduct qualifies as willful and wanton is generally an issue of fact for the jury. *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 27, 104 N.E.3d 436. "However, where *** discovery has been completed and what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered." (Internal quotation marks omitted.) *Id.*

¶ 61 C. This Case

¶ 62 1. *Intentional Removal of a Safety Feature*

¶ 63 As an initial matter, we conclude no evidence in the record exists to demonstrate

the Park District removed or gave permission to a third party to remove the bollard that caused Murphy's accident. Murphy argues there is "ample evidence" from which a reasonable jury could infer that the Park District was responsible for removing the bollard. Murphy relies on the following facts: (1) he had noticed the grass along the trail had been mowed, (2) he heard machinery that could have been lawn mowers, and (3) the Park District admitted it mowed the grass and sometimes needed to remove a bollard to do so. Murphy also argues that the Park District gave keys to its locks only to its employees.

¶ 64        However, no person testified when the grass was cut or that the machinery Murphy heard was actually a lawn mower, much less that it was the Park District using the machinery. And although the Park District had the only keys to *its* locks, the uncontradicted testimony was that other entities or persons placed their own locks on some pins or otherwise gained access through other means, including vandalism. All of the Park District employees denied that the Park District removed the bollard and denied ever giving another entity permission to do the same. At his deposition, Murphy admitted it would be speculation to say that Park District employees removed the bollard, and we agree. "[U]nsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact [citation]." *Valfer*, 2016 IL 119220, ¶ 20.

¶ 65        2. *Utter Indifference to or Conscious Disregard for the Safety of Others*

¶ 66        Because there is no evidence the Park District removed the bollard, Murphy may recover only if he can establish that the Park District (1) knew the removal (without replacing) of bollards created a dangerous condition, (2) knew previous accidents or injuries occurred because bollards were removed and not replaced, and (3) did not act to prevent their removal. See *Dunbar*, 250 Ill. App. 3d at 792.

¶ 67        Murphy argues the collar that held the bollard in place was inherently dangerous because it was a raised obstacle in the middle of the bike path. The Park District responds that the collar was dangerous only if the bollard was missing. The Park District contends that, because there is no evidence it was responsible for removing the bollard and no evidence that it was aware anyone had been injured by a removed bollard, it cannot be guilty of willful and wanton conduct.

¶ 68        Murphy counters that the Park District was aware that third parties routinely broke the locks and removed the bollards without replacing them. Indeed, Park District employees testified that they found bollards missing up to 10 times per year. Accordingly, Murphy claims the Park District was aware of a recurring dangerous condition and was willful and wanton by failing to address it. We disagree.

¶ 69        In support of his argument that the Park District was aware of the danger, Murphy relies upon *Buford v. Chicago Housing Authority*, 131 Ill. App. 3d 235, 237-38, 476 N.E.2d 427, 430 (1985), a case in which a nine-year-old girl fell down an elevator shaft when she was pushed into the exterior doors and the bottom gave way. Testimony at trial revealed that metal clips held the bottom of the doors in place, and defendants were aware that these clips were routinely and repeatedly disengaged from their sills and damaged by vandalism. *Id.* at 238, 241. Repairmen would bend the clips back to repair them, but this weakened the clips; they would eventually replace the clips when they became too worn. *Id.* at 238, 240. The jury found for the plaintiff, and the defendants appealed. *Id.* at 241.

¶ 70        On appeal, the defendants argued they lacked notice of the dangerous condition. *Id.* at 245. The First District held "the regular recurrence of the same type of vandalism involving the same elevator rendered subsequent such acts foreseeable and imposed a duty on [the housing

authority] to take steps to prevent or control the vandalism, or at least to warn of the dangerous situation such acts potentially created." *Id.* at 247.

¶ 71　　　　The problem for Murphy is that, even if we were to accept that the missing bollards in the instant case were the same as the damaged clips in *Buford* (a proposition that is not entirely convincing), *Buford* dealt with ordinary negligence. At most, the Park District's conduct in this case with respect to the bollards would be negligent, which is not enough to support the willful and wanton standard. See *Burke*, 148 Ill. 2d at 450 ("[T]here is a qualitative difference between negligence and willful and wanton conduct.").

¶ 72　　　　We recognize that Murphy relies on *Buford* to demonstrate that the Park District had constructive notice of a dangerous condition. But he fares no better under the cases he relies upon for the willful and wanton issue.

¶ 73　　　　In *Cohen*, the Illinois Supreme Court recently addressed the willful and wanton standard in the context of a bike path. *Cohen*, 2017 IL 121800, ¶ 1. There, someone notified the Chicago Park District there was a crack in the pavement of a lakefront bike path. *Id.* ¶ 11. The park district inspected the crack and slated it for an expedited repair but took no further action at that time, such as barricading the path or marking the crack. *Id.* ¶¶ 11-12. The plaintiff sued after the crack caused him to fall off his bike (*id.* ¶ 1), but the supreme court concluded that summary judgment was properly entered in favor of the park district because it did not engage in willful or wanton misconduct (*id.* ¶ 34).

¶ 74　　　　Relevant here, the court in *Cohen* concluded the risk of injury from the crack was "nothing like the extraordinary and unusual risk *** in *Palmer* [*v. Chicago Park District*, 277 Ill. App. 3d 282, 660 N.E.2d 146 (1995) (holding park district potentially liable for failing to correct or warn about 30-foot section of fence that was laying in park for three months)]." *Id.* ¶ 31.

"Moreover, there were no prior injuries involving the crack, which would have alerted defendant to any *extraordinary risk or danger* to the users of the path." (Emphasis added.) *Id.* The court held that "to equate defendant's actions in this case with willful and wanton conduct would render that standard synonymous with ordinary negligence." (Internal quotation marks omitted.) *Id.* ¶ 33.

¶ 75        The same is true here. Nothing in this case indicates that the bollard was exceptionally dangerous, either in place or on the rare occasions it was missing. No injury had ever occurred as a result of the bollard being down. The only injury related to a bollard at all occurred when a woman hit one that was in place and functioning as designed. Further, the Park District trained its employees to routinely inspect bollards to make sure they were present and locked in place. Employees immediately replaced any missing bollards when observed or notified. Even when viewed in the light most favorable to Murphy, the facts of this case do not even suggest that the Park District acted in conscious disregard of a "highly unreasonable risk of harm." (Internal quotation marks omitted.) *Burke*, 148 Ill. 2d at 448.

¶ 76        We view *Fennerty v. City of Chicago*, 2015 IL App (1st) 140679, 33 N.E.3d 737, as particularly instructive, analogous, and well reasoned. In *Fennerty*, a woman walked her dog in a large grassy area between lanes of a boulevard in Chicago. *Id.* ¶ 5. She tripped over an electrical box that was raised about three inches above the ground. *Id.* The appellate court affirmed the entry of summary judgment in favor of the city on the issue of willful and wanton conduct. *Id.* ¶ 23.

¶ 77        The record demonstrated the city inspector knew about the specific box at issue but did not consider it dangerous. *Id.* The settling of ground around the boxes happened naturally over time and to all electrical boxes. *Id.* There was no evidence that the city was aware of any

prior injuries involving the box the plaintiff tripped over. *Id.* The First District concluded as follows: "Although the city's conduct could arguably be characterized as negligent, it did not show an actual or deliberate intention to cause harm or an utter indifference to, or conscious disregard for, the safety of others." *Id.*

¶ 78     Likewise, in this case, the Park District was aware that bollards on rare occasions had been removed in the past, but it was not aware that this particular bollard had been removed, and it was not aware that the removal of any bollard had ever caused any injury to a visitor. See *A.D. v. Forest Preserve District of Kane County*, 313 Ill. App. 3d 919, 924-25, 731 N.E.2d 955, 960 (2000) (reversing jury verdict in favor of child who ran into a thorny tree while playing tag in a picnic area and concluding the defendant was not willful and wanton for leaving the tree in place because it was not "unreasonably dangerous" and there was no evidence that any one else had been injured by it). Based on our review of the record, we agree with the trial court's conclusion that no reasonable jury could find that the Park District acted in a willful and wanton manner.

¶ 79     In closing, we thank the trial court for its lengthy docket entry explaining its decision, which this court found helpful to the resolution of this case.

¶ 80                               III. CONCLUSION

¶ 81     For the reasons stated, we affirm the trial court's judgment.

¶ 82     Affirmed.

- 19 -

| **Cite as:** | *Murphy v. Springfield Park District*, 2019 IL App (4th) 180662 |
| --- | --- |
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 16-L-178; the Hon. John M. Madonia, Judge, presiding. |
| **Attorneys for Appellant:** | Nathan L. Wetzel, of Graham & Graham, Ltd., of Springfield, for appellant. |
| **Attorneys for Appellee:** | Craig L. Unrath, of Heyl, Royster, Voelker & Allen, P.C., of Peoria, and Gary S. Schwab, of Heyl, Royster, Voelker & Allen, P.C., of Springfield, for appellees. |